**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

**ADLYNN K. HARTE,**                                )
**ROBERT W. HARTE,**                            )
**J.H., a minor, by and through**              )
**his parents and next friends,**              )
**ADLYNN K. HARTE and**                        )
**ROBERT W. HARTE, and**                       )
**L.H., a minor, by and through**              )
**her parents and next friends,**              )
**ADLYNN K. HARTE and**                        )       **Case No. _____**
**ROBERT W. HARTE,**                            )
                                                        )
          **Plaintiffs,**                       )
                                                        )
**vs.**                                          )
                                                        )
**THE BOARD OF**                                 )
**COMMISSIONERS OF THE**                         )
**COUNTY OF JOHNSON, KANSAS**;                   )
and                                              )
**FRANK DENNING,** Sheriff,                      )
in his official and individual                   )
capacity;                                         )
**MARK BURNS,** deputy,                          )
in his individual capacity;                      )
**EDWARD BLAKE,** deputy,                        )
in his individual capacity;                      )
**MICHAEL PFANNENSTIEL,** deputy,               )
in his individual capacity;                      )
**JAMES COSSAIRT,** deputy,                      )
in his individual capacity;                      )
**LARRY SHOOP**, deputy,                         )
in his individual capacity;                      )
**LUCKY SMITH**, deputy,                         )
in his individual capacity; and                  )
**CHRISTOPHER FARKES**, deputy,                  )
in his individual capacity,                      )

          **Defendants.**


**COMPLAINT WITH DEMAND FOR JURY TRIAL**

1

Plaintiffs Adlynn K. Harte, Robert W. Harte, and their minor children, J.H. and L.H., through their parents and next friends, demand a jury trial on all claims stated in this Complaint, which include claims under the Fourth and Fourteenth Amendments of the United States Constitution, 42 U.S.C. § 1983 and the law of the State of Kansas.

## PRELIMINARY STATEMENT AND INTRODUCTION

1.  The present civil rights case arises from an early morning, swat-style raid on the Leawood home of Adlynn Harte and Robert Harte and their two young children.  The Hartes – targeted as marijuana growers on the basis of innocent purchases and the brewing of loose tea leaves that they discarded in their trash – were intimidated, accused, traumatized and held under armed guard for 2½ hours despite the fact it was clear that the warrant, on its face, rested on virtually no grounds.  Moreover, even if "probable cause" existed at the outset – which it did not – it vanished in the first three minutes when the deputies storming the house found that the Hartes' hydroponic garden contained only vegetable plants.    Despite the clear failure of their search – which the deputies said was aimed at finding "a major grow operation" – the deputies held the Hartes under armed guard and proceeded to search virtually every square inch of the home, insisting the Hartes had "narcotics," and then, when even a drug dog turned up nothing, suggested that the Hartes' son, who had just turned 13 years old, should be evaluated for drug use.

2.  The raid began just before the Hartes were set to arise for a day of work and school.  Just before 7:30 a.m., a team of law enforcement officers garbed in riot gear rushed at the Hartes' front door, stacked in formation and brandishing firearms and a battering ram.

3.  The officers were deputies with the Johnson County Sheriff's Department, carrying

out what the Sheriff called "Operation Constant Gardener," a high-publicity initiative timed to coincide with an unofficial April 20 marijuana "holiday" among drug users.  The Sheriff had a press conference scheduled for 2 p.m. that day and hoped to make a big announcement about drugs confiscated and arrests made.

4.   Neither Bob Harte nor Addie Harte has ever used any type of illegal drugs or associated with anyone involved with drug activity.    What they did do was attempt to grow a few vegetable plants in an indoor hydroponic garden.  Also, Addie Harte liked to brew her favorite teas using loose tea leaves, which she discarded in the kitchen trash.

5.  Both Addie Harte and Bob Harte spent many years working in a United States intelligence agency in Washington, D.C.,  before moving to Kansas City to raise their children in a quiet, family-oriented neighborhood.   Neither of them ever dreamed that Mr. Harte's cultivation of a small indoor vegetable garden – started as an educational project with their son – or Mrs. Harte's tea drinking would lead them to be targeted by law enforcement as marijuana growers.

6.   Remarkably, it was *these two innocent activities* <u>*alone*</u> *– with no corroborating evidence –*  that caused law enforcement to target the Hartes during "Operation Constant Gardener."   Some eight months earlier, Mr. Harte had been observed with their two children leaving the Green Circle, a store that sells hydroponic growing equipment primarily to organic gardeners.  Mr. Harte carried a small bag of merchandise, most likely some type of plant fertilizer.

7.  When the date of April 20, 2012 neared, deputies traced Mr. Hartes' license plate to the Hartes' Leawood address and decided to dig through their trash.  What deputies did *not* do

3

was conduct any type of drug investigation – no surveillance, no interviews with neighbors, no searching their files for any tips, no thermal imaging, and no checking of electrical records or anything else that might suggest an indoor grow operation.

8.  On three occasions in April 2012, Sheriff's deputies confiscated the Hartes' trash as it sat at the curb.  Digging through the plastic kitchen bags, they discovered what they called "saturated plant material," which they claimed was marijuana that had been processed to extract the active substance THC.

9.  Although the deputies had access to the services of the fully equipped Johnson County crime lab, they chose to forego the lab's reliable test procedures and instead used a "field test" which was "presumptive," but not "conclusive" for the presence of marijuana.  The field test was not intended to be used with saturated samples, and scientific studies had shown it had a 70% false positive rate, particularly with regard to food items commonly discarded in kitchen trash.

10.  When deputies obtained two "positive" results from the "plant material," they did not question the dubious results – even though the "plant material" did not resemble marijuana.  Indeed, the saturated material appeared to be exactly what it was – high-end tea containing a variety of tea leaves, and perhaps some dried fruit.   With only the now-stale Green Circle purchase and the "positive" field test results, the deputies sought a search warrant for the Hartes' residence.

11.  A Johnson County judge signed the warrant – which contained no information acknowledging the plant material did not resemble marijuana, or that it was found in the kitchen trash or that the field test was not reliable.

4

12.  Even assuming deputies had probable cause when they entered the Hartes' home, any legal justification to be there vanished in the first three minutes when they went to the basement and discovered not marijuana plants, but a few scraggly vegetable plants.

13.  The deputies' invasion – excessive in its level of force and prolonged far beyond the point of any legal justification – trampled the constitutional rights of the Hartes and their two young children.    The Fourth Amendment interests of citizens, which include their sense of security and individual dignity, are afforded their greatest protection in the safety of their homes. The deputies' actions destroyed the Hartes' sanctuary and their sense of safety and security in their home.  The deputies' reckless and malicious acts caused severe fright, shock, humiliation and ongoing emotional distress to the Hartes and their children – harms intensified by Sheriff Denning's statements at a broadcast news conference touting the success of 2012's Operation Constant Gardener.  There was no mention that deputies came up empty-handed at any house; in fact, the claim of "success" suggested that everyone searched – by implication including the Hartes – was involved in illegal drugs.

## JURISDICTION

14.  Jurisdiction is conferred by 28 U.S.C. §§ 1331 and 1343, which provide for original jurisdiction of this Court in suits based respectively on federal questions and authorized by 42 U.S.C. § 1983, to redress the deprivation under color of state law, statute, ordinance, regulation, custom or usage of any right, privilege, or immunity secured by the Constitution of the United States or by any act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States.

15.  Plaintiffs further invoke the supplemental jurisdiction of this Court to hear and

decide their related claims arising under state law as provided in 28 U.S.C. § 1367.

16.  Plaintiffs' actions for damages are authorized by:

(a) 42 U.S.C. § 1983, which provides for redress for the deprivation under color of any statute, ordinance, regulation, custom or usage of any state or territory of any rights, privileges or immunities secured to all the citizens or persons within the jurisdiction of the United States;

(b) The Fourth and Fourteenth Amendments of the United States Constitution;

(c) The Kansas Tort Claims Act,  K.S.A. 75-6101, et seq.;

(d) The common law of the State of Kansas; and

 (e)  42 U.S.C. § 1988, which authorizes Plaintiffs' application for attorneys' fees and provides that a court may award a reasonable attorneys' fee as part of costs in any action or proceeding to enforce a provision of 42 U.S.C. § 1983.

17.  Venue is proper in the United States District Court for the District of Kansas under 28 U.S.C. § 1391(a)(2), as the events or omissions giving rise to Plaintiffs' claims occurred in Leawood, Johnson County, Kansas.

## THE PARTIES

18.  Plaintiffs Robert W. Harte and Adlynn K. Harte, husband and wife, reside in Leawood in Johnson County, Kansas.

19.  J.H and L.H. are minor children, and bring this lawsuit through their parents and next friends, Robert W. Harte and Adlynn K. Harte.   J.H. was 13 years old at the time of the incident that is the subject of this suit, and L.H. was age seven.

20.  Defendant Board of Commissioners of the County of Johnson, Kansas, was created by, and established under, the laws of the State of Kansas. It is authorized to sue or be sued in its corporate name.  The Sheriff's Department is a department within the County of Johnson.  It may

6

be served with process by serving the Clerk of the Board of County Commissioners at 111 S. Cherry, Suite 3300, Olathe, Kansas, 66061.

21.  Frank Denning is, and was at all times relevant to this Complaint, the Sheriff of Johnson County, Kansas.  He is the final policymaker for the Sheriff's Department regarding the training and supervision of his employees.  As a supervisor, he may also be held liable for intentionally or recklessly failing to properly supervise or train his subordinates. He is sued in his individual and official capacities.

22.  Mark Burns is a sworn law enforcement officer and is employed as a deputy in the Johnson County Sheriff's Department.  He is sued in his individual capacity.

23.  Edward Blake is a sworn law enforcement officer and is employed as a deputy in the Johnson County Sheriff's Department.  He is sued in his individual capacity.

24.  Michael Pfannenstiel is a sworn law enforcement officer and was employed as a lieutenant in the Johnson County Sheriff's Department during the time period relevant to this Complaint.  He is presently a Captain in the Sheriff's Department.   He is sued in his individual capacity.

25.  James Cossairt is a sworn law enforcement officer and is employed as a sergeant in the Johnson County Sheriff's Department.  He is sued in his individual capacity.

26.  Larry Shoop is a sworn law enforcement officer and is employed as a deputy in the Johnson County Sheriff's Department.  He is sued in his individual capacity.

27.  Lucky Smith is a sworn law enforcement officer and is employed as a deputy in the Johnson County Sheriff's Department.  He is sued in his individual capacity.

28.  Christopher Farkes is a sworn law enforcement officer and is employed as a deputy in the Johnson County Sheriff's Department.  He is sued in his individual capacity.

29.  All of the individual Defendants, at all times material to this Complaint, acted under color of state law.

## FACTUAL BACKGROUND

30.  Robert and Adlynn Harte reside on a quiet street in Leawood, Kansas, with their two young children.   Mrs. Harte works as in-house counsel at a financial services firm.  Mr. Harte, whose background is in computer networks, stays home to care for the couple's two children.

31.  Before moving to Kansas City, Adlynn Harte and Robert Harte were employed by the CIA in Washington, D.C., both of them holding positions that required passing rigorous background checks.  Indeed, both Hartes had the highest level of security clearance.

32.  Looking for a quiet neighborhood in which to raise their children, the Hartes moved to the Kansas City area in 1999, and have lived in the same house in Leawood since 2004.

33.  The Hartes' nightmarish encounter with law enforcement began at about 7:30 a.m. on April 20, 2012.  They were just starting to get ready for the day when Mr. Harte heard a pounding at the front door, so loud it shook the door.  As he opened the door, he saw several law enforcement officers lined up – garbed in raid gear and armed with assault rifles – with one officer carrying a battering ram, ready to crash through their front door.

34.  The officers entered the house screaming, yelling commands at Mr. Harte to get down.   The Hartes were shocked and frightened.  Mr. Harte immediately complied, and laid shirtless, face down, on the floor of the foyer.

35.  Mrs. Harte descended the stairs from her bedroom, frightened and bewildered amid the shouting and the raid-clad officers streaming into her basement.  Her husband was laying prone behind the front door, an officer displaying an assault rifle over him.  A typical weekday

morning had turned shocking and surreal.  One of the officers, betraying the sketchy state of the officers' knowledge of the household, asked: "Are there any kids in the house?"  Mrs. Harte was horrified, realizing that their seven-year-old daughter, who typically arises early, could have been the first at the door, facing a phalanx of officers who had no idea that children were in the home.

36.  The Hartes' son came out of his bedroom, hands up.  Their daughter, only seven, was shocked and confused.

37.  Within minutes, the deputies who rushed to the basement knew the twin pillars of their dubious "probable cause" had collapsed.  The warrant they had obtained was based on two "facts" – that Mr. Harte had shopped at a store selling hydroponic equipment and supplies of the type that could be used to grow marijuana, and that wet "plant material" which tested "positive" for marijuana had been found in the Hartes' trash.

38.  Instead of finding a marijuana "grow operation," the deputies instead found five or six struggling plants – tomatoes, squash and melon.  They tested the "plant material" and the test was negative.  *At that moment, whatever pretense the deputies had as to probable cause vanished.*   Because the so-called probable cause was based on a purchase at a hydroponic store and suspicious "plant material," as soon as the deputies knew that the hydroponic garden included only vegetable plants and the "plant material" was not marijuana, they should have immediately departed.

39.   Instead, the deputies – apparently intent on finding *something* incriminating -- continued to search every square inch of the Hartes' house for the next 2 ½ hours.

40.  When Addie Harte and the children first came downstairs, they were told to sit, legs

crossed, next to Mr. Harte in the foyer.  Mr. Harte was then permitted to sit up while deputies searched the couch.   The deputies then directed all four to sit on the couch, and held them there – in front of their large picture window  – while an armed deputy stood guard and told them they could not move.

41.    The deputies initially refused to show the warrant to either Bob Harte or Addie Harte.  They told them they could not move from the couch, and an armed deputy stood nearby. The officers all appeared to be deputies with the Johnson County Sheriff's Department, although one of the deputies claimed that a Leawood officer was present earlier but "must have left."   The Hartes never saw a Leawood police officer, however.

42.   Although by turns petrified and stunned, both Mr. Harte and Mrs. Harte managed to tell the deputies they were in the wrong house.  They asked the deputies to prove they were in the correct residence by telling them their names.  One deputy told Addie Harte that her name was something like "Adele."

43.   The deputies searched every room of the Hartes' residence, going through closets and dresser drawers, containers, and even Mr. Harte's toilet kit bag.  After 2 ½ hours, they found absolutely nothing –   no drugs, no drug paraphernalia, no evidence of any illegal activity.  It was obvious after the discovery of the vegetable plants that the prolonged and illegal search was aimed simply at uncovering *something* that would get the deputies off the hook for their improper actions.  But the Hartes had never used any type of drugs, and there was nothing to find.

44.   Throughout the search, the deputies betrayed their frustration with rude comments, telling the Hartes they had not found "anything *yet* " – as if the incriminating discovery was just around the corner, in the next drawer.   One of the deputies also told the Hartes that deputies

"knew" they had "narcotics" in the house, despite all indication to the contrary.

45.  After the Hartes were seated on the couch, both Mr. Harte and Mrs. Harte were separately taken to the kitchen and Mirandized.  Alarmed by the deputies' errors and the frightening atmosphere, both Hartes refused to answer questions.  They also told deputies they could not interview their 13-year-old son.

46.  Addie Harte asked to see the warrant, but one of the deputies said they did not have to give it to them until they left.   Eventually, though, one of the deputies did provide it, and he made clear they were looking for a "major grow operation" for marijuana, not "personal use." Given that the deputies had discovered within minutes of entering the house that the hydroponic garden had vegetable, not marijuana, plants, the Hartes were not only frightened, but also increasingly upset.   As two former employees of the United States government, they had always reassured their son, in particular, that the country's government was upright and reliable, that it worked as it should and targeted the "bad guys," not innocent citizens.  Amidst the deputies in raid gear destroying the family's privacy and probing through every inch of their home looking for a "grow operation" that obviously wasn't there, the Hartes could find no authentic words of reassurance for their frightened and bewildered children.

47.   When the Hartes asked the deputies the basis for the warrant, one of the deputies said "seeds and stems" had been found on their property.  Not understanding the reference, Mrs. Harte asked what "seeds and stems" were, and the deputy said they were discarded from "cheap pot."

48.  After finding nothing in their search, the deputies even had a drug dog brought in from another jurisdiction, and, again, discovered no evidence of drug activity.

49.  At that point, they finally decided to leave, giving the Hartes a search warrant receipt

11

stating "No items taken."   The receipt was signed by Deputy Blake, who had appeared to be in charge throughout the raid.

50.  The deputies then tried to cover themselves by suggesting that the Hartes' son, who had just turned 13, had been using marijuana.  A deputy suggested that the Hartes could take him to a pediatrician for drug testing and have a "family meeting" regarding personal use of marijuana.

51.  After the deputies left, the Hartes were stunned.  They could scarcely believe what had just happened to them.  They felt thoroughly humiliated and embarrassed in their suburban neighborhood, where all of their neighbors could see evidence of the raid – numerous law enforcement vehicles lined up in the street and deputies in raid gear carrying assault rifles.  Afterward, Mr. Harte felt compelled to go door-to-door explaining that he and his wife had nothing to do with drugs and showing the receipt stating, "No items taken."

52.  The Hartes also felt humiliated by the media comments of Sheriff Denning, who touted the success of the 2012 raids, even though all of the raids (across the metropolitan area) only netted 43 marijuana plants and just over a pound of processed marijuana.  Referring to marijuana, Sheriff Denning intoned: "We do take this very seriously."

53.  After the raid, the Hartes contacted a lawyer, who, along with another attorney, tried to find out what had happened by making inquiries in Johnson County law enforcement.  The word came back that deputies had found "seeds and stems" in the Hartes' trash.   The Hartes were horrified, and, at least initially, believed someone had planted something in their trash.

54.  Unknown to the Hartes at that time, the deputies finally submitted the "saturated plant material" to the Johnson County Criminalistics Lab several days *after* the raid.  Reliable laboratory tests produced a negative result, conclusively establishing the "plant material" was *not*

marijuana.  In fact, it tested high in "caffeine" – which is not surprising for tea leaves.  The lab analyst also commented that the plant material did not resemble marijuana when viewed through the microscope or with the naked eye.

55.  Although Johnson County deputies were aware that the Hartes had inquired through an attorney about why they had been targeted, they did not inform the Hartes or their attorney that in fact the Hartes' trash contained no "seeds and stems" and deputies had found nothing incriminating in the trash.

56.  Persisting in their effort to find out how the deputies had gotten a warrant, the Hartes retained an attorney to pursue an action under the Kansas Open Records Act (KORA).   On August 10, 2012, an attorney for the Hartes sent a letter to the Johnson County Sheriff's Department seeking the disclosure of records under KORA concerning the April 20, 2012 search of the Hartes' home.  Although the Sheriff's Department knew that no illicit substances had been found in the Hartes' trash and that no criminal case could be charged, it responded in an August 16, 2012, letter stating that the "records you requested are a part of our criminal investigation records.  As such the Sheriff respectfully declines to produce them at this time."

57.  On September 21, 2012, the Hartes' counsel sent a second letter to the Sheriff's Department, requesting the disclosure of any records relating to any surveillance of the Hartes' home.  In a letter dated September 28, 2012, the Sheriff again declined to disclose the requested records because they were allegedly part of the department's "criminal investigation records."

58.  On March 28, 2013, counsel for the Hartes filed a petition in Johnson County District Court under the Kansas Open Records Act seeking all documents relating to the raid and search of the Hartes' home as well as other related documents.

59. As a result of that request, and subsequent follow-up requests, the Sheriff's Department eventually produced various documents relating to their investigation of the Hartes, including "incident/investigation" reports, the search warrant and the affidavit for search warrant; property receipts, and laboratory reports.

60. The documents provided showed the following:

(a) The raids launched as part of "Operation Constant Gardener" are based on the assumption that some marijuana users grow their own marijuana, using equipment purchased at stores that sell indoor gardening equipment.

(b) Despite this assumption, the Johnson County Sheriff's Department appears to have *no* information suggesting what percent of customers at the Green Circle or any other hydroponic store actually purchase equipment or supplies for the purpose of growing marijuana. Indeed, the stores appear to cater to organic gardeners.

(c) Surveillance at the "Green Circle" caused Robert Harte to be identified as a "white male subject" who was seen leaving the store with two children on August 9, 2011, carrying "a small bag of merchandise."

(d) The so-called "tip" about Mr. Harte's purchase came from Missouri Highway Patrol Sergeant Jim Wingo, who has fashioned the notion that a customer at a hydroponic store can be viewed as a potential criminal suspect.

(e) Wingo also appears to be a central character in spreading "Operation Constant Gardener" across the metropolitan area, conducting regular surveillance at the Green Circle and then farming out "tips" to area law enforcement agencies. Customers spotted at the store are traced through their car license plate to their home address.

(f) In the Hartes' case, nothing was done with Sergeant Wingo's "tip" about Mr. Harte for eight months until April 2012, when Operation Constant Gardener (April 20) approached. Wingo passed along the sighting, and the Hartes' trash was seized on three occasions − April 3, April 10 and April 17 − as the Sheriff's Department prepared for its annual publicity binge.

(g) Although nothing in the Hartes' trash was "field tested" on April 3, 2012, one of the two deputies leading the investigation reported later that "plant material" located in the trash that day was discarded because it was found among "other innocent plant material" and had been "misidentified."

(h) On April 10, 2012, Deputy Burns and another deputy collected three sacks of the Hartes' trash, finding one cup of what they called "wet marijuana plant material."  The "material" tested "positive" for "the presence of THC," the active substance in marijuana.

 (i) On April 17, 2012, Deputy Burns and Deputy Blake seized two trash sacks at the curb of the Hartes' residence, this time finding "¼ cup of saturated marijuana plant material" that "was consistent with the material found in the previous weeks" and which tested "positive" for THC.

(j) The affidavit for search warrant, signed by Deputy Burns,  stated that the "plant material" was "thoroughly saturated" by "some liquid," and, based on his experience, it appeared as though it may have been processed for the "extraction of ...THC."

(k) The deputy stated in the affidavit that the "test is presumptive but not conclusive" for the presence of marijuana.

(l)   The deputy did not acknowledge in the affidavit that the field tests are not to be used with saturated or liquid samples and that the "false positive" rate of the test used is 70 percent. Many common botanical substances from the kitchen or yard also test positive, including vanilla,

anise, peppermint, ginseng, eucalyptus, cinnamon, basil, lemon grass, lavender, cloves, cypress, ginger, oregano – and tea.

(m) The wet plant material was *not* submitted to the Johnson County Sheriff's Criminalistics Laboratory for testing until some days *after* the April 20 raid.

(n) On May 1, 2012, the Crime Lab tested two samples of the wet plant material, seized on April 10 and April 17, 2012, and issued a report stating: "No controlled substances were identified."

(o)  When the crime lab further examined the plant material in August 2012, it concluded that "macroscopically" and microscopically, it did not appear to be marijuana.  Not surprisingly, it tested high for caffeine.

61.  Defendants' actions in this case were intentional, wanton, malicious and taken with reckless disregard for the truth.  With evidence that was not even sufficient to support "reasonable suspicion," defendants procured a search warrant.  The affidavit supporting the warrant rested on two scraps of information that were both misleading and meaningless.  Shopping at a gardening store primarily frequented by organic gardeners is – in the absence of other information – hardly incriminating.  And the information about the "saturated marijuana plant material" – also meaningless – failed to mention that the "plant material" did not resemble marijuana, was found in the kitchen trash and tested "positive" with a field test that has a 70 percent false positive rate with common botanical substances.

62.  Defendants used the defective warrant to launch a swat-style raid that was not an exercise of legitimate law enforcement power, but was rather a high publicity operation intended to benefit the image of the Sheriff and his Department.   Lacking any reliable information about the Hartes, Defendants nonetheless dispatched deputies garbed in raid gear and brandishing

16

assault rifles.

63.  Perhaps most stunning, once the Defendants' so-called "probable cause" vanished with the discovery that the hydroponic garden held only vegetable plants, they nonetheless continued to occupy and search the premises.  With no legal justification whatsoever, they remained for 2 ½ hours, holding the Hartes and their young children prisoners in their own home, ordering them to remain seated under armed guard in front of their picture window, while other families walked past, taking their children to school.

64.  Defendants' use of force was excessive.  In the absence of any information suggesting any threat posed by the Hartes, Defendants launched a raid with a heavily armed swat-type team.   Although Mr. Harte offered no resistance, they ordered him to the floor, where he laid, prone and shirtless, with a deputy brandishing an assault rifle standing above him.

65.  Instead of admitting their error when they realized the hydroponic garden contained only vegetable plants, Defendants instead tried to "cover" themselves by searching every corner of the house for something incriminating against the Hartes.  They came up empty, then tried to suggest their son had a drug problem.

66.  Compounding the injuries to the Hartes, once Defendants knew conclusively, from lab testing, that the "saturated plant material" was not marijuana, no one took any steps to inform the Hartes.  Instead, the Hartes continued to worry that some unknown person had planted "seeds and stems" in their trash.

67.  The entire experience caused great trauma to the Hartes and their children, and has resulted in ongoing humiliation, embarrassment and emotional distress.  Defendants' actions violated the Hartes' sense of safety and security in their home and forever altered their faith and belief in law enforcement.

68.   At all times relevant to this Complaint, Defendant Frank Denning was the Sheriff and final policymaker for the Johnson County Sheriff's Department.  He is responsible for guiding the Department with proper policies and for ensuring the proper supervision and training of its law enforcement officers.

69.   The actions of Defendants in this case reflect inadequate policies and training, which directly caused the violation of Plaintiffs' constitutional rights under the Fourth and Fourteenth Amendments, and under the common law of the State of Kansas.

70.   On April 17, 2013, the Hartes provided notice of their state claims under Kansas state law, K.S.A. 12-105(b), to the Board of Commissioners of the County of Johnson and to Sheriff Frank Denning and the deputies involved in the search.  Their claim was deemed denied, by operation of law, after 120 days.  As permitted by law, they are filing this lawsuit within 90 days of that denial.  *See* K.S.A. 12-105(b).

71.   All acts of Defendants which are the subject of this lawsuit were taken under color of state law.

## Count I

**Claim  Against Defendants Denning, Burns, Blake, Pfannenstiel, Cossairt, Shoop, Smith and Farkes Under 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments for Conducting a Search of Plaintiffs' Home in the Absence of Probable Cause, by Relying on a Warrant that Was Facially Deficient or Which Relied on Materially False or Misleading Statements**

Plaintiffs reallege the foregoing, and further state as follows:

72.   The Fourth Amendment protects Americans from unreasonable searches and seizures, with the highest level of protection afforded the home.

73.   Acting under color of state law, Defendants Burns, Blake, Pfannenstiel, Cossairt, Shoop, Smith and Farkes entered the home of Adlynn and Robert Harte in the absence of

18

probable cause either to search the home or arrest any occupant.

74. The Defendants who illegally entered the Hartes' home, or assisted those who did, acted under the direction and control of Defendant Denning, who also acted under color of state law and was personally and directly involved in Operation Constant Gardener.

75. Although Defendants had a warrant signed by a Johnson County District Court judge, the warrant lacked probable cause on its face, relying on two meaningless pieces of information – an innocent purchase at a gardening store and the application of a grossly unreliable field test – to generate so-called probable cause.

76. Because of this, the judge's approval of the warrant was merely of the "rubber stamp" variety, and any reasonable law enforcement officer would have known, from the face of the affidavit, that the warrant was not valid and did not rest on adequate indicia of probable cause.

77. To the extent the affidavit's recitation of probable cause appeared to provide any legal basis for the warrant whatsoever, the information relied upon to support probable cause was false and misleading, and rendered wholly unreliable by material omissions.

78. The warrant provided no basis for concluding that a purchase at a gardening store supplied probable cause, as there was no showing as to what percentage of customers at such stores are actually marijuana growers. Moreover, the affidavit did not disclose that the "saturated plant material" did not visually resemble marijuana and was found in the kitchen trash – raising a reasonable presumption that it was some type of herb or foodstuff. The affidavit also did not disclose that the "field test" used the KN reagent, which has a 70 percent false positive rate when tested on common household and yard botanicals.

79. Defendants' actions were intentional, wanton and malicious and taken with reckless

disregard for the truth.   Defendants knew or should have known that they lacked any probable cause whatsoever to enter and search Plaintiffs' home.

80.  Defendants' actions violated Plaintiffs' rights to be secure in their own home and to be free of unreasonable searches and seizures, thereby violating the Fourth Amendment.

81.  Defendants' actions also violated Plaintiffs' rights to substantive due process under the Fourteenth Amendment.

82. All Defendants are liable for their participation in the raid of the Hartes' home, including Sheriff Denning for his role in guiding and directing Operation Constant Gardener. Sheriff Denning is liable for his direct participation, and/or for directing his subordinates, or by approving or ratifying a series of acts that he knew or should have known would result in the deprivation of a citizen's constitutional rights.

83.  Defendants' actions proximately and directly caused Plaintiffs to suffer grievous and continuing injuries, including humiliation, embarrassment and emotional distress.

## Count II

**Claim Against Defendants Burns, Blake, Pfannenstiel, Cossairt, Shoop, Smith and Farkes Under 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments for Unreasonable Execution of Search Warrant by Continuing the Detention or Arrest of Plaintiffs and the Search of their Home After it was Clear that any Claim to Probable Cause Had Vanished**

Plaintiffs reallege the foregoing and further state as follows:

84.  Acting under color of state law, Defendants Burns, Blake, Pfannenstiel, Cossairt, Shoop, Smith and Farkes continued their illegal search of Plaintiffs' home and maintained their illegal detention of Plaintiffs long after it was clear that any claim to probable cause had vanished in the first three to five minutes after Defendants' entry into the home.

85.  When Defendants first stormed the residence, they went immediately to Plaintiffs'

basement and inspected the hydroponic garden.  They discovered it contained vegetable, not marijuana, plants.  They even tested some of the plant material, and it tested "negative" with the field test.

86.  At that point, all probable cause to be in the residence and to detain or arrest the Plaintiffs during the search vanished.  Both prongs of the two-prong affidavit had collapsed.  The purchase at the hydroponic store was for innocent purposes, not the cultivation of marijuana.  And the "plant material" from the Hartes' home was not part of a "grow operation" or any effort to "process" marijuana to extract THC.

87.  At that point, Defendants were legally required to leave immediately.  Yet, they did not, and they continued to occupy the Hartes' home for another 2 ½ hours, engaging in an illegal search in the hope of finding *anything* incriminating to pin on Plaintiffs.  They also told Plaintiffs that they were not free to leave and held them under armed guard on their couch, thus subjecting Plaintiffs to illegal arrest.

88.  Defendants' actions were intentional, wanton and malicious and taken with reckless disregard for the truth.   Defendants knew or should have known that they lacked any probable cause whatsoever to continue their search of Plaintiffs' home and to maintain their detention and arrest of Plaintiffs.

89.  Defendants' actions violated Plaintiffs' rights to be secure in their own home and to be free of unreasonable searches and seizures, thereby violating the Fourth Amendment.

90.  Defendants' actions also violated Plaintiffs' rights to substantive due process under the Fourteenth Amendment.

91.  Defendants' actions proximately and directly caused Plaintiffs to suffer grievous and continuing injuries, including humiliation, embarrassment and emotional distress.

21

**Count III**

**Claim Against Defendants Burns, Blake, Pfannenstiel, Cossairt, Shoop, Smith and Farkes Under 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments for Unconstitutional Use of Excessive Force**

Plaintiffs reallege the foregoing and further state as follows:

92.  Defendants Burns, Blake, Pfannenstiel, Cossairt, Shoop, Smith and Farkes executed the illegal search of the Hartes' home and secured their illegal detention through the use of unconstitutional and excessive force.

93.  Defendants possessed no information to suggest that Adlynn Harte or Robert Harte posed any type of threat to them.

94.  Moreover, nothing occurred during the search to suggest that any of the Plaintiffs posed any danger whatsoever to law enforcement.   Indeed, Plaintiffs were fully compliant throughout the search.

95.   In fact, it was law enforcement officers who posed a serious threat to the Hartes, by rushing their door early in the morning, brandishing assault rifles and entering with *no knowledge* as to whether children lived in the home, and, if so, what their ages were.  The Hartes' daughter, then in kindergarten, is an early riser, and typically would have been the first to answer the door.  The fact that Defendants knew *nothing* about the family demonstrates the reckless nature of their operation.

96.  In complete ignorance of any facts about the Hartes and in the absence of any reliable facts suggesting any member of the family had committed any crime, Defendants raided the Plaintiffs' home in an overwhelming and frightening show of force.  The deputies wore raid gear, carried assault rifles and were poised to use a battering ram.

97.  No family member resisted any command or failed to cooperate in any way.  Yet,

Mr. Harte was ordered to hit the floor, and laid prone and shirtless before his frightened children. All four family members were ordered to sit on the couch and not move, and remained under armed guard throughout the search.

98.  The arrest and search were without probable cause and were conducted with an excessive and unnecessary level of force.

99.  The Defendants' use of force was not objectively reasonable, and therefore violated the Fourth Amendment.

100.  Defendants' actions also violated Plaintiffs' rights to substantive due process under the Fourteenth Amendment.

101.  Defendants' actions proximately and directly caused Plaintiffs to suffer grievous and continuing injuries, including humiliation, embarrassment and emotional distress.

**Count IV**

**Claim Against Board of Commissioners of Johnson County and Against Sheriff Denning Under 42 U.S.C. § 1983, *Monell v. New York City Dep't of Soc. Serv.* and the Fourth and Fourteenth Amendments**

Plaintiffs reallege the foregoing and further state as follows:

102.  Sheriff Denning is the final policymaker for the Johnson County Sheriff's Department, and thus for Defendant Board of Commissioners of Johnson County in the matters delegated or entrusted to him.

103.  Both before and at the time of the events alleged in this Complaint, the Sheriff's Department, which is a Department of Johnson County, had policies, practices, customs and procedures which operated to deprive Plaintiffs and similarly situated citizens of their constitutional rights under the Fourth and Fourteenth Amendments.

104.  Acting under color of state law, the individual Defendants violated Plaintiffs' constitutional rights as stated above.  Those violations occurred as a direct result of the failure of the Sheriff's Department and Defendant Denning to guide and supervise their deputies with adequate policies and by a similar failure to provide adequate training.

105.  Sheriff Denning and the Board of Commissioners of Johnson County are accountable under 42 U.S.C. § 1983 because they established policies and practices that were intended to and did encourage, endorse, and permit their agents and employees to violate the constitutional rights of Plaintiffs and similarly situated individuals.  At a minimum, Sheriff Denning and the Board of Commissioners of Johnson County were deliberately and recklessly indifferent to such constitutional violations.

106.  The unconstitutional policies, practices, customs and procedures of the Sheriff's Department and Johnson County include, but are not limited to:

(a)  A policy, practice, custom and procedure of intentionally or recklessly using unreliable drug field tests, without regard to whether such tests produce reliable results;

(b) A policy, practice, custom or procedure of relying on meaningless or unreliable information in support of warrants and of failing to develop an adequate showing of probable cause to support the issuance of warrants, or to conduct a search or make an arrest.

(c)  A policy, practice, custom or procedure of failing to use reliable investigative techniques to investigate drug crimes.

(d)  A policy, practice, custom or procedure of employing excessive force, especially in the use of swat-style raids when such raids are unnecessary and the occupants of the home pose no threat to law enforcement officers.

107.  In addition to failing to establish adequate policies, practices, customs and

24

procedures, Sheriff Denning and the Board of Commissioners of Johnson County have also failed to provide adequate training to deputies in the following areas:

(a)  the proper investigation of suspected drug crimes;

(b)  the identification of illicit substances, including marijuana plants and processed marijuana;

(c)  the proper use of drug field tests and their reliability and limitations;

(d) the establishment of probable cause to support a search warrant, or to conduct a search or make an arrest;

(e)  the reasonable use of force, including the proper deployment of swat-style teams.

108.  Sheriff Denning and the Board of Commissioners of Johnson County established, maintained and are responsible for the inadequate training and the inadequate policies, practices, customs and procedures, as described above.

109. The inadequate policies¸ practices, customs and procedures, and the inadequate training were implemented intentionally and/or recklessly to deprive citizens, including Plaintiffs, of their constitutional rights and were a direct and proximate cause of the constitutional violations and injuries set forth in this Complaint.

110.  The constitutional violations committed by Defendants arose from circumstances that constitute a usual and recurring situation.

111.  The Department and Sheriff Denning's inadequate training practices and their failure to adequately supervise their deputies led directly to the violation of Plaintiffs' constitutional rights under the Fourth and Fourteenth Amendments.

112.   The Department and Sheriff Denning's inadequate policies, practices, customs and procedures as listed above led directly to the violation of Plaintiffs' constitutional rights under

the Fourth and Fourteenth Amendments.

113.  The Department and Sheriff Denning's failures to adequately guide, train and supervise their law enforcement personnel proximately and directly caused Plaintiffs to suffer grievous and continuing injuries, including humiliation, embarrassment and emotional distress.

## Supplemental State Claims

114.  With regard to the State claims, all defendants not only acted at all times under color of state law but as agents or employees of the Board of Commissioners of Johnson County. The Board of Commissioners of Johnson County is liable under the doctrine of *respondeat superior*.  Alternatively, with regard to intentional torts, the Board of Commissioners of Johnson County, through its Sheriff's Department, is liable for the failure to properly train and supervise its employees, and/or to establish appropriate policies, as described above.

## Count V

### State Law Claim Against all Defendants for Trespass

Plaintiffs reallege the foregoing and further state as follows:

115.  Without legal right or justification, Defendants intentionally entered the home of Plaintiffs.

116. To the extent Defendants claim probable cause to justify their entry, such alleged probable cause collapsed upon Defendants' discovery that Plaintiffs' hydroponic garden contained vegetable, not marijuana, plants.  At that point, Defendants lacked any further legal right or justification to remain on the property of Plaintiffs.

117.  Defendants' actions directly caused Plaintiffs to suffer grievous and continuing injuries, including humiliation, embarrassment and emotional distress.

26

118.  The individual Defendants are each liable, individually and jointly, for the harm to Plaintiffs, and the Board of Commissioners of Johnson County is liable for the harm to Plaintiffs under the doctrine of *respondeat superior*.

### Count VI

### State Law Claim Against All Defendants for Assault

Plaintiffs reallege the foregoing and further state as follows:

119.   By entering the home swat-team style, with an overwhelming show of force and the brandishing of weapons, Defendants intentionally threatened or attempted to do bodily harm to Plaintiffs, resulting in the Plaintiffs suffering the immediate apprehension of bodily harm.

120.  In addition to placing all four Plaintiffs in reasonable apprehension of bodily harm, Defendants also overwhelmed Mr. Harte with an even more aggravated show of force, confronting him at his front door and ordering him to the floor while a deputy stood over him brandishing an assault rifle.

121.  Defendants' actions directly caused Plaintiffs to suffer grievous and continuing injuries, including humiliation, embarrassment and emotional distress.

122.  The individual Defendants are each liable, individually and jointly, for the harm to Plaintiffs, and the Board of Commissioners of Johnson County is liable for the harm to Plaintiffs under the doctrine of *respondeat superior*.

### Count VII

### State Law Claim Against All Defendants for False Arrest and Imprisonment

Plaintiffs reallege the foregoing and further state as follows:

123.  Defendants' restraint of Plaintiffs' freedom was without legal justification, most particularly after the collapse of the alleged "probable cause" stated in the affidavit supporting

27

the search warrant.

124.  Defendants, by their words and acts, indicated that Plaintiffs were not free to leave and that they must obey all of Defendants' commands, under threat of physical force.

125.  Defendants' actions directly caused Plaintiffs to suffer grievous and continuing injuries, including humiliation, embarrassment and emotional distress.

126.  The individual Defendants are each liable, individually and jointly, for the harm to Plaintiffs, and the Board of Commissioners of Johnson County is liable for the harm to Plaintiffs under the doctrine of *respondeat superior*.

## Count VIII

### State Law Claim Against All Defendants for Abuse of Process

Plaintiffs reallege the foregoing and further state as follows:

127.  Prior to entering the Hartes' home, Defendants obtained a search warrant based on two meaningless pieces of information – shopping at the gardening store and discarding "saturated plant material" in the kitchen trash.  Defendants did not conduct any actual investigation to determine if Plaintiffs had any involvement with drugs.   Even knowing that eight months had elapsed since the "tip" that Mr. Harte was observed at the Green Circle, Defendants did not conduct any surveillance of the Hartes, interview their neighbors, search their police files for tips, conduct thermal imaging or check electrical records or anything else that might suggest an indoor grow operation.

128.  Defendants' goal was simply to line up a suitable number of targets for Operation Constant Gardener 2012.  Before the results of the searches were fully known, Sheriff Denning had already issued a press release promising an announcement at 2 p.m. about the raids.

129.  The focus on publicity, coupled with the failure to conduct a legitimate drug

investigation, indicates that Defendants obtained the search warrant and launched the raid for the purpose of meeting the objectives of the Sheriff's high-publicity initiative.  Simply put, the raids were not a legitimate law enforcement operation but rather were part of a publicity binge intended to place the Sheriff and the Department in a positive light.

130.  As a result of the abuse of process, Plaintiffs were subjected to an unconstitutional search and seizure, and also suffered other wrongs under state law.

131. Defendants' actions directly caused Plaintiffs to suffer grievous and continuing injuries, including humiliation, embarrassment and emotional distress.

132.  The individual Defendants are each liable, individually and jointly, for the harm to Plaintiffs, and the Board of Commissioners of Johnson County is liable for the harm to Plaintiffs under the doctrine of *respondeat superior*.

## Count IX

### State Law Claim Against All Defendants for Intentional Infliction of Emotional Distress

Plaintiffs reallege the foregoing and further state as follows:

133.  The unconstitutional and tortious conduct of Defendants as alleged above was intentional and/or reckless. Further, the conduct of Defendant was extreme and outrageous and directly led to the extreme, severe and ongoing humiliation and emotional distress of Plaintiffs.

134.  The individual Defendants are each liable, individually and jointly, for the harm to Plaintiffs, and the Board of Commissioners of Johnson County is liable for the harm to Plaintiffs under the doctrine of *respondeat superior*.

## Count X

### State Law Claim Against All Defendants for False Light/Invasion of Privacy

Plaintiffs reallege the foregoing and further state as follows:

135.  Sheriff Denning and the Department's public information officer issued a press release and other statements to the media about the success of 2012's Operation Constant Gardener.  Their press release headlined the arrest of 13 persons "during Marijuana Sting" and claimed that "over 40 live marijuana plants" had been seized, along with a pound of processed marijuana and several grams of other drugs including hashish and methamphetamine.  Those statements were published and broadcast throughout the local media, including several newspapers and the local television stations.

136.  At no point did the Sheriff or anyone in the Department acknowledge that any of the raids were unsuccessful or that deputies had come up empty-handed at any home in their search for drugs.  The clear implication from the Sheriff's statements was that the agency had targeted and arrested individuals who were involved with drugs and that the deputies had been highly successful in their efforts.

137.  It was clear to anyone living in the Hartes' neighborhood that Plaintiffs were one of the targeted families.  Deputies' vehicles filled the street in front of the Hartes' home, and deputies garbed in raid gear and brandishing assault rifles were seen rushing the Hartes' front door before 7:30 a.m.  Any reasonable person would conclude the obvious – the Hartes had been targeted as part of Operation Constant Gardener.  The Sheriff's statements placed Plaintiffs in a false light by suggesting that all of those targeted had been involved with drugs – either as users, or growers, or dealers.  The Sheriff never acknowledged that anyone had been wrongly targeted, as his entire goal was to get positive publicity for his Department.

138.  When the Sheriff touted the success of the raids, and, by implication, suggested that all of those targeted were involved with drugs, he made a misrepresentation that would be highly offensive to a reasonable person.

139.  Defendants' actions directly caused Plaintiffs to suffer grievous and continuing injuries, including humiliation, embarrassment and emotional distress.

140.  The individual Defendants are each liable, individually and jointly, for the harm to Plaintiffs, and the Board of Commissioners of Johnson County is liable for the harm to Plaintiffs under the doctrine of *respondeat superior*.

### Claim for Damages

141.  The actions of Defendants violated Plaintiffs' civil rights under the Fourth and Fourteenth Amendments and also violated the law of the State of Kansas.

142.  The intentional, malicious, and/or reckless actions or omissions of Defendants caused Plaintiffs to suffer severe and ongoing humiliation, shame, embarrassment and emotional distress.

143.  The individual Defendants' actions were deliberate, wanton, malicious and/or cruel, thus justifying an award of punitive damages.

### Prayer for Relief

WHEREFORE, Plaintiffs request the following relief:

1.   That this Court assume jurisdiction of this cause to determine this controversy and set this case for hearing on the merits.

2.   The award of compensatory damages to the four Plaintiffs in the amount of $5,000,000.00.

3.   The award of punitive damages against the individual Defendants, jointly and severally, in the amount of $2,000,000.00

4.   The award by this Court, pursuant to 42 U.S.C. §1988, of reasonable attorneys' fees, as well as costs and expenses, and also to grant such alternative relief as may seem to the Court

just, proper and equitable.

## Jury Trial Demand

Plaintiffs demand a jury trial, pursuant to the Seventh Amendment to the Constitution of the United States, as to all claims for damages.

## Place of Trial

Plaintiff designates Kansas City, Kansas, as the place of trial.

Respectfully submitted:

  /s/  Cheryl A. Pilate
Cheryl A. Pilate, KS No.14601
Melanie S. Morgan, KS No. 16088
MORGAN PILATE LLC
926 Cherry Street
Kansas City, Missouri 64106
Telephone: (816) 471-6694
Facsimile: (816) 472-3516
Email: cpilate@morganpilate.com
Email: mmorgan@morganpilate.com

Attorneys For Plaintiff