## IN THE UNITED STATES DISTRICT COURT
### DISTRICT OF KANSAS

**Adlynn K. Harte et al.,**

**Plaintiffs,**

v.                                                                    **Case No. 13-2586-JWL**

**Board of Commissioners of the
County of Johnson County, Kansas et al.,**

**Defendants.**

### <u>MEMORANDUM & ORDER</u>

In August 2011, plaintiff Robert Harte was observed by law enforcement leaving a hydroponics store in Kansas City, Missouri with a small bag of merchandise. More than seven months later, that information, along with Mr. Harte's license plate number, was provided by law enforcement to the Johnson County Sheriff's Office. Sheriff's deputies subsequently collected trash from plaintiffs' residence and, on two separate occasions, discovered what they described as saturated plant material. On both occasions, a field test of the substance tested positive for the presence of marijuana. Based on the fact that Mr. Harte had been observed at the hydroponics store months earlier and that the field tests yielded positive results, deputies submitted an application and supporting affidavit for a search warrant for plaintiffs' residence to a Johnson County district judge, who issued the search warrant. The warrant was executed on April 20, 2012. No evidence of marijuana or other contraband was uncovered during the search.

Plaintiffs filed this action against various defendants alleging violations of 42 U.S.C. § 1983 for unlawful search, unreasonable execution of the search and excessive force in violation

of the Fourth and Fourteenth Amendments. Plaintiffs also assert a claim for municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  Finally, plaintiffs assert numerous state law claims against defendants, including trespass, assault, false arrest, abuse of process, intentional infliction of emotional distress and false light/invasion of privacy.

This matter is presently before the court on defendants' motions for summary judgment on all of plaintiffs' claims.  As explained in more detail below, defendants' motions are granted in their entirety.[1]

## I. Facts

Consistent with the applicable standard, the following facts are uncontroverted, stipulated by the parties, or related in the light most favorable to plaintiffs, the non-moving parties.  On August 9, 2011, defendant Missouri State Highway Patrol Sergeant Jim Wingo observed plaintiff Robert Harte leaving the Green Circle hydroponics store in Kansas City, Missouri.  Mr. Harte was carrying a small bag and was accompanied by two children.  More than seven months later, on March 20, 2012, Sergeant Wingo provided to the Johnson County Sheriff's Office a spreadsheet of Johnson County residents who were seen shopping at the Green Circle hydroponics store.  That spreadsheet included information that led Johnson County Sheriff's deputies to Mr. Harte's residence—including the make and model of Mr. Harte's vehicle and his license plate number.  The spreadsheet was provided by Sergeant Wingo to assist the Sheriff's Office in its "Operation Constant Gardener" initiative, a concerted effort by the Sheriff's Office

---

[1] Plaintiffs' motion to exclude or limit certain opinion testimony is also ripe for resolution. Because the court concludes that summary judgment on qualified immunity grounds is appropriate, that motion is moot.

to conduct numerous drug raids on April 20 of each year to coincide with the date that has become an unofficial holiday among marijuana users.

On April 3, 2012, Johnson County Sheriff's Office Deputies Mark Burns and Edward Blake collected trash from a trash receptacle at the curb outside of the Leawood, Kansas address associated with the vehicle that Robert Harte had driven to the Green Circle. The deputies found indicia of occupancy for the Hartes as well as wet, saturated plant material. Because the deputies believed that the material was "innocent plant material," they did not field test that material. One week later, on April 10, 2012, deputies Mark Burns and Nate Denton collected trash from the curb at the Hartes' residence. The deputies transported three trash bags back to the Johnson County Sheriff's Office operations building for inspection. In the Hartes' kitchen trash, Deputy Burns discovered approximately one cup of saturated green vegetation similar to what he had seen the prior week. Deputy Burns testified that the vegetation was "hard to identify" and that he considered that the substance might be some type of consumable herb or vegetable. But because the material was thoroughly saturated and "processed," Deputy Burns testified that he "thought" it might have been processed for the extraction of THC. Deputy Burns further testified that, in light of his uncertainty, he brought the substance to his supervisor, Sergeant Reddin. Deputy Burns and Sergeant Reddin both testified that they unrolled some of the leaves and observed at least one serrated leaf, which heightened Deputy Burns' suspicion that the substance was marijuana. At that point, Deputy Burns field tested a sample of the material and obtained a positive result for the presence of THC. Deputy Burns utilized a KN reagent field test manufactured by Lynn Peavey.

On April 17, 2012, deputies Mark Burns and Edward Blake again collected trash from the curb at plaintiffs' residence.  They again transported trash bags back to the Sheriff's Office operations building and, once again, discovered in the kitchen trash approximately ¼ cup of saturated plant material consistent with what they had seen on April 3, 2012 and April 10, 2012. Deputy Blake field tested a sample of the plant material using the Lynn Peavey KN reagent field test.  That test yielded a positive result for the presence of THC.  That same day, deputy Burns drafted an affidavit for search warrant of the Hartes' residence.  In the warrant affidavit, deputy Burns averred that a white male subject driving a vehicle registered to Adlynn Harte had been observed leaving the Green Circle in August 2011 with small bag of merchandise; that the Green Circle sells hydroponic grow equipment and materials commonly used in the cultivation of marijuana; that deputies conducted a trash pull at the Hartes' residence on April 10, 2012 in which they discovered "a sizable quantity (approximately 1 cup) of green vegetation which appeared to be wet marijuana plant material (leaves and stems)."  Deputy Burns averred that the material "was thoroughly saturated by some liquid and, based on the Affiant's law enforcement training and experience, it appeared as though it may have been processed for the extraction of tetrahydrocannabinol (THC) from the plant material."  Deputy Burns averred that he field tested a sample of the plant material which showed a positive response for the presence of THC.  He continued:

> The field test utilized consists of reagents similar to those utilized by the Johnson County Criminalistics Laboratory to conduct its initial screening test for marijuana.  This test is presumptive but not conclusive for the presence of marijuana.

Deputy Burns noted in the affidavit that a similar quantity of plant material was discovered in the April 3, 2012 trash pull but that the material was discarded without testing because it was "misidentified" by the affiant as "innocent plant material."

In further support of the search warrant application, deputy Burns averred that another trash pull was conducted at the Hartes' residence on April 17, 2012 and that deputies discovered "approximately ¼ cup of saturated marijuana plant material (leaves and stems) which was consistent with the material found in the previous weeks." Deputy Burns averred that Deputy Blake field tested a sample of that plant material which showed a positive result for the presence of THC. Finally, Deputy Burns detailed in the affidavit his experience in investigating indoor marijuana grow operations and, more generally, his experience in law enforcement and narcotics investigations.

Later that day, Deputy Burns met with Johnson County Assistant District Attorney Laura Smith, who reviewed and approved the search warrant affidavit. Deputy Burns and ADA Smith both brought the affidavit to Johnson County District Judge Peter Ruddick. Judge Ruddick signed the warrant on April 17, 2012. The warrant permitted the residence to be searched for "Marijuana in all forms to include, but not limited to, marijuana plants and plant material, marijuana seeds, marijuana in any stages of growth and/or processing; Drug Paraphernalia used to cultivate and/or process marijuana to include, but not limited to, packaging material, trimmers, scales, dryers, and hanging systems, and drug paraphernalia used to introduce drugs into the body; and, indicia of occupancy."

On April 20, 2012, seven deputies from the Johnson County Sheriff's Office executed the search warrant at plaintiffs' residence: Sergeant James Cossairt; Deputy Edward Blake; Deputy

Larry Shoop; Deputy Lucky Smith; Deputy Christopher Farkes; Deputy Tyson Kilbey; and Deputy Laura Vrabac.  At the time of the execution of the warrant, the residence was occupied by plaintiffs Robert and Adlynn Harte and their two minor children.  According to Mrs. Harte, she awoke on the morning of April 20, 2012 to the sounds of "screaming and loud banging, so hard that the walls were rattling."  Viewed in the light most favorable to plaintiffs, the evidence reflects that five deputies pounded on the door shortly before 7:30am (Sergeant Cossairt and Deputy Vrabac went to the backyard of plaintiffs' residence) and that Mr. Harte opened the door at the command of the deputies.  At that point, all five deputies flooded the foyer of the Hartes' residence.  One of those deputies was wearing a standard patrol uniform and the others were wearing thick bulletproof vests with black t-shirts bearing the word "SHERIFF" in white letters on the back. [2]  All deputies were armed and were carrying their weapons at the "low-ready" position.[3]  One deputy carried an AR-15 rifle and the others carried Glocks.  The deputies ordered Mr. Harte to lie down on the ground and he complied without hesitation.  At the same time, Mrs. Harte appeared at the landing at the top of the stairs leading down into the foyer.  Mrs. Harte avers that she observed a deputy standing over her husband while holding an assault rifle.  It is undisputed, however, that no deputy ever pointed a weapon at Mr. Harte or at any other plaintiff.  Moreover, it is undisputed that none of the deputies ever touched any of the plaintiffs in any respect.

---

[2] Sergeant Cossairt, who entered the foyer after the initial entry, was wearing khaki pants and a sweater.

[3] According to Deputy Tyson Kilbey, the "low ready" position involves gripping the weapon with the dominant hand and pointing the muzzle or barrel of the weapon "at a very steep angle towards the ground."  This evidence is not disputed.

Within minutes, the deputies had cleared the house and moved Mr. and Mrs. Harte, since joined by their children in the foyer, into the living room.  The deputies then began to search the residence for evidence of marijuana.  For the duration of the two-and-one-half hour search, plaintiffs were kept under "armed guard" in the living room and were required to seek permission to use the restroom, handle their phones or, in the case of the children, use gaming devices.  Within 15 to 20 minutes of commencing the search, the deputies realized that they would not discover a massive marijuana grow operation as they had suspected.  In fact, they discovered that the hydroponic garden did not contain any live marijuana plants and, instead, contained only tomato plants.  Nonetheless, the deputies continued to search the residence for evidence of a dismantled marijuana grow operation and, finally, for evidence of "personal use" of marijuana.  Ultimately, the deputies concluded their search at approximately 10:00am.  No evidence of marijuana or other contraband was found.  At some point, the Sheriff's Office discovered that the plant material in the Hartes' trash was nothing more than loose tea leaves that had been brewed by Mrs. Harte and discarded in the kitchen trash.

Over the next two days, various news outlets in Kansas City reported on "Operation Constant Gardener" and touted its success.  The Sheriff's Office also conducted a press conference covered by the media in which it announced the success of the operation, including the seizing of drugs, cash and firearms at the homes of "average Johnson County families" in places like "Leawood."  The Sheriff's Office did not clarify in these reports that at least one search did not uncover any contraband.   According to plaintiffs, then, neighbors who witnessed the raid on plaintiffs' home and later saw the news reports about the raids were left with the impression that contraband was discovered at plaintiffs' home.

7

Additional facts will be provided as they relate to the specific arguments raised by the parties in their submissions.

## II.    Standard

"Summary judgment is appropriate if the pleadings, depositions, other discovery materials, and affidavits demonstrate the absence of a genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Fields v. City of Tulsa*, 753 F.3d 1000, 1009 (10th Cir. 2014); *see* Fed. R. Civ. P. 56(a).  A factual dispute is genuine "if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.*  A factual issue is material "if under the substantive law it is essential to the proper disposition of the claim." *Id.*  The nonmoving party "is entitled to all reasonable inferences from the record; but if the nonmovant bears the burden of persuasion on a claim at trial, summary judgment may be warranted if the movant points out a lack of evidence to support an essential element of that claim and the nonmovant cannot identify specific facts that would create a genuine issue." *Water Pik, Inc. v. Med-Systems, Inc.*, 726 F.3d 1136, 1143-44 (10th Cir. 2013).

When, as here, the defendants have asserted quailed immunity at the summary judgment stage, the court's factual analysis relative to the qualified-immunity question is distinct:

> [T]he objective is not to determine whether a plaintiff survives summary judgment because plaintiff's evidence raises material issues that warrant resolution by a jury. Instead, the principal purpose is to determine whether plaintiff's factual allegations are sufficiently grounded in the record such that they may permissibly comprise the universe of facts that will serve as the foundation for answering the legal question before the court.

*Cox v. Glanz*, 800 F.3d 1231, 1243 (10th Cir. 2015). (quoting *Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1326 (10th Cir.2009) (Holmes, J., concurring)).  The "universe of facts" is comprised of uncontested facts and contested material facts favorable to the party claiming injury.  *Weigel v. Broad*, 544 F.3d 1143, 1156 (10th Cir. 2008) (O'Brien, J., dissenting).  After the universe of relevant facts is distilled from the record, the court determines whether those facts "demonstrate" the violation of a clearly established constitutional right.  *Id.*

## III.    Constitutional Claims

In the pretrial order, plaintiffs have asserted four § 1983 claims—a claim for unlawful search; a claim for unreasonable execution of the search; a claim for excessive force; and a claim for municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  Plaintiffs' claim for unlawful search is asserted against all individual defendants, including defendant Wingo, based on each defendant's personal participation in the unlawful search or that defendant's direction, supervision or setting in motion a series of events that caused the constitutional deprivation.  Plaintiffs' claims for unreasonable execution of the search and excessive force are asserted against all individual defendants except for defendant Wingo. Plaintiffs' *Monell* claim is asserted against the Board of Commissioners of Johnson County and Sheriff Denning.

The individual defendants each assert a qualified immunity defense.   Qualified immunity "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Thomas v. Durastanti*, 607 F.3d 655, 661 n.4 (10th Cir. 2010).   When a defendant asserts qualified immunity at summary judgment, the "burden shifts to the plaintiff to show that: (1) the

defendant violated a constitutional right and (2) the constitutional right was clearly established." *Courtney v. Oklahoma ex rel. Dep't of Public Safety*, 722 F.3d 1216, 1222 (10th Cir. 2013) (quoting *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013)).  The court maintains the discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Id.*  (quoting *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).  If the plaintiff, however, fails to establish a violation of the law, then the court need not reach the issue of whether the law was clearly established.  *Reynolds v. Powell*, 370 F.3d 1028, 1029 (10th Cir. 2004).

A.     *Unlawful Search*

In the pretrial order, plaintiffs assert that defendants violated plaintiffs' Fourth and Fourteenth Amendment rights by conducting a search of plaintiffs' home in the absence of probable cause.  More specifically, plaintiffs contend that defendants cannot rely on the warrant that was issued by the state court judge because defendants misrepresented or omitted material facts to the judge in obtaining the warrant.  In the context of a qualified immunity defense on an unlawful search claim, the court determines whether a defendant violated clearly established law "by asking whether there was 'arguable probable cause'" for the challenged conduct. *Stonecipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir. 2014) (quoting *Kaufman v. Higgs*, 697 F.3d 1297, 1300 (10th Cir. 2012)).  Arguable probable cause "is another way of saying that the officers' conclusions rest on an objectively reasonable, even if mistaken, belief that probable cause exists."  *Id*. (citing *Cortez v. McCauley*, 478 F.3d 1108, 1120 (10th Cir. 2007)).  A

defendant "is entitled to qualified immunity if a reasonable officer could have believed that probable cause existed" to perform the search. *See id*.

A neutral judge's issuance of a warrant is "the clearest indication that the officers acted in an objectively reasonable manner or . . . in 'objective good faith.'" *Id.* (quoting *Messerschmidt v. Millender*, ─── U.S. ───, 132 S. Ct. 1235, 1245 (2012) (quoting *United States v. Leon*, 468 U.S. 897, 922–23 (1984))). But the fact that a judge has issued a warrant authorizing the search "does not end the inquiry into objective reasonableness." *Id.* at 1141-42 (quoting *Messerschmidt*, 132 S Ct. at 1245). If "it is obvious that no reasonably competent officer would have concluded that a warrant should issue," the warrant offers no protection. *Id.* at 1142 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Qualified immunity will not be granted "where the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id.* (quoting *Messerschmidt*, 132 S. Ct. at 1245).

Similarly, a warrant offers no protection to officers who misrepresent or omit material facts to the judge who issued the warrant. *Id.* The burden is on the plaintiff to "make a substantial showing of deliberate falsehood or reckless disregard for truth" by the officer seeking the warrant. *Id*. (quoting *Snell v. Tunnell*, 920 F.2d 673, 698 (10th Cir. 1990)). This test is an objective one: when there is no dispute over the material facts, a court may determine as a matter of law whether a reasonable officer would have found probable cause under the circumstances. *Id.* (citing *Cortez*, 478 F.3d at 1120–21 ("The conduct was either objectively reasonable under existing law or it was not.")). Qualified immunity applies equally to

11

reasonable mistakes of law and fact.  *Id.* (citing *Herrera v. City of Albuquerque*, 589 F.3d 1064, 1070 (10th Cir. 2009)).

To establish reckless disregard in the presentation of information to a judge, "there must exist evidence that the officer in fact entertained serious doubts as to the truth of his allegations . . . and [a] factfinder may infer reckless disregard from circumstances evincing obvious reasons to doubt the veracity of the allegations."  *Id.* (quoting *Beard v. City of Northglenn*, 24 F.3d 110, 116 (10th Cir. 1994)).  "[T]he failure to investigate a matter fully, to exhaust every possible lead, interview all potential witnesses, and accumulate overwhelming corroborative evidence rarely suggests a knowing or reckless disregard for the truth.  To the contrary, it is generally considered to betoken negligence at most." *Id.* (quoting *Beard*, 24 F.3d at 116; *Wilson v. Russo*, 212 F.3d 781, 787–88 (3d Cir. 2000) (holding that omissions are made with reckless disregard if an officer withholds a fact that any reasonable person would have known a judge would wish to know and that assertions are in reckless disregard of the truth if they are made "with a high degree of awareness of the statements' probable falsity" (internal quotation marks and alterations omitted)).

With this legal framework in mind, the court turns to plaintiffs' arguments.  In their submissions, plaintiffs do not contend that the warrant affidavit is "so lacking in indicia of probable cause" that the judge should not have issued the warrant.  Rather, plaintiffs contend that Deputy Burns misrepresented and omitted material facts to Judge Ruddick and that a "reconstructed" affidavit that included the omitted facts and excised the misrepresentations would have lacked probable cause.  *See Puller v. Baca*, 781 F.3d 1190, 1197 (10th Cir. 2015) (if an officer includes false statements in a warrant affidavit or recklessly omits information, court

measures probable cause by removing false information, including omitted information and inquiring whether modified affidavit establishes probable cause); *Wilson*, 212 F.3d at 789 (after finding omissions or misrepresentations, court must engage in "reconstructive surgery" and assess whether the omissions and statements were material to the finding of probable cause).

*Assertions*

In his affidavit, Deputy Burns averred that he field tested the plant material that officers discovered on April 10, 2012 and the field test "showed a positive response for the presence of THC."  Similarly, Deputy Burns averred that Deputy Blake field tested the plant material that officers discovered on April 17, 2012 and the field test "showed a positive response for the presence of THC."  The fact that Deputy Burns' affidavit states that the material found in the Hartes' trash on two consecutive weeks field-tested positive for the presence of THC is a hurdle that is all but impossible for plaintiffs to overcome.  As courts have recognized, a reasonably trustworthy field test that returns a positive result for the presence of drugs is a sufficient basis, in and of itself, for probable cause.  In *Lamping*, for example, the Sixth Circuit held that even if other statements concerning probable cause were removed from a warrant application, probable cause nonetheless existed for the search of the plaintiff's residence based solely on the officer's statement that a substance found in plastic baggies field-tested positive for drugs such that the plaintiff's "sole hope" was to attempt to raise a material issue about whether the officer's statement about the results of the test was deliberately or recklessly false.  *See Lamping*, 30 Fed. Appx. at 580; *Simms v. McDowell*, 2009 WL 3160353, at *5 (W.D. Ky. Sept. 25, 2009) (positive field test described in warrant application provided sufficient probable cause for

13

warrant).  To overcome the obstacle created by the positive field tests, plaintiffs contend (as they must) that the representations concerning the positive test results are either deliberately false (plaintiffs allege that the tests in fact came back negative but Deputy Burns reported that the tests were positive) or simply wrong because the deputies misinterpreted the results of the test through their own negligence (that is, the tests in fact came back negative but the deputies interpreted the results as positive due to lack of training or their failure to follow the manufacturer's instructions).

In support of their argument that Deputy Burns deliberately lied about the test results, plaintiffs rely primarily on evidence that their expert, Michael D. Bussell, field tested the same plant material seized from plaintiffs' trash and obtained a negative result using the same Lynn Peavey KN reagent field test that the deputies used in testing the plant material.  No reasonable jury could infer from this evidence that Deputy Burns lied about the test results.  Mr. Bussell's field test was conducted in May 2015, more than three years after the material was seized and tested by the defendants.  There is no evidence in the record from which a jury could conclude that the plant material was sufficiently the same in terms of its chemical makeup in May 2015 as compared to April 2012 such that Mr. Bussell's negative test result could support a further inference that Deputy Burns must have obtained a negative field test in April 2012.  The multiple inferences required to support a finding that Deputy Burns lied are simply too attenuated from the evidence.

Plaintiffs also highlight that Mr. Bussell, in May 2015, brewed and field tested several varieties of tea blends commonly used by Mrs. Harte in April 2012 and that he consistently obtained negative results using tests with the KN reagent.  As Mr. Bussell's expert report

indicates, however, he actually obtained a false positive result on a sample of "Snow Geisha" brewed tea leaves using a field test kit with the Duquenois-Levine reagent—a test that plaintiffs assert is far superior and more accurate than the test utilized by the deputies in April 2012.  The fact that plaintiff's expert obtained a false positive result when testing brewed tea leaves undercuts plaintiffs' theory that Deputy Burns must have lied about obtaining a positive test result in April 2012.  Rather, it shows that false positives can occur when field testing tea leaves.  And the fact that Mr. Bussell at other times obtained negative results on various brewed tea samples using the KN reagent is not sufficient to permit the inference that Deputy Burns lied about the April 2012 test results.

Moreover, other evidence submitted by plaintiffs further dispels any inference that Deputy Burns lied about the April 2012 test results.  Specifically, plaintiffs highlight certain case notes from Melinda Spangler, a laboratory technician with the Johnson County Sheriff's Office Crime Laboratory.  Ms. Spangler indicates that, in August 2012, she field tested the samples obtained from plaintiffs' trash using the same field test kits that the deputies used and that she also obtained positive results from that testing on both samples.  Plaintiffs have not challenged Ms. Spangler's findings in any respect or suggested that Ms. Spangler lied in reporting her results.  In the absence of any other evidence suggesting that the deputies in April 2012 in fact obtained negative test results but falsely reported positive test results in the warrant application, plaintiffs have not made a "substantial showing of deliberate falsehood" on the part of Deputy Burns. *See Stonecipher*, 759 F.3d at 1142.

As an alternative to their theory that Deputy Burns lied in the affidavit about obtaining positive field test results, plaintiffs contend that Deputy Burns and Deputy Blake in fact

obtained negative results but misinterpreted the test and read the results wrong.  Even assuming that the deputies negligently reported inaccurate test results, that conduct would not invalidate the warrant.  *Franks v. Delaware*, 438 U.S. 154, 171 (1978) (allegations of negligence or innocent mistake are not sufficient to invalidate a warrant).   Plaintiffs, then, are left with the fact that deputies obtained positive test results in two consecutive weeks on the plant material obtained from plaintiffs' trash.  While it is uncontroverted that those positive test results were "false" positives in that the plant material did not contain THC and subsequent laboratory tests returned negative results, the fact that the field test results were not accurate does not undermine the validity of the warrant application where there is no evidence that Deputy Burns or Deputy Blake recklessly disregarded information suggesting that the field tests were unreliable or inaccurate.  *See Molina ex rel. Molina v. Cooper*, 325 F.3d 963, 971 (7th Cir. 2003) (affirming grant of qualified immunity to officers; the fact that post-search lab tests came back negative such that field tests results were "false positives" did not undermine probable cause where potential unreliability of field tests was determined only after the warrant was obtained and there was no evidence officer thought the field tests were unreliable when he applied for the warrant); *Lamping v. Walraven*, 30 Fed. Appx. 577, 580 (6th Cir. 2002) (affirming grant of qualified immunity to officer where search affidavit was based on false positive field test results; false positives do not "retroactively eliminate probable cause" at the time the warrant was issued; post-search lab tests returning a negative result, without more, cannot support an inference that the officer lied about field test results and there was no evidence that officer knew the field test results were false when he signed the affidavit); *Herron v. Lew Sterrett Justice Center*, 2007 WL 2241688, at *3 (N.D. Tex. 2007) (negative laboratory test after false positive field test does not

negate the existence of probable cause at the time of arrest); *Hines v. Port Authority of New York and New Jersey*, 2000 WL 420555, *4-5 (S.D.N.Y. 2000) (field tests showing the white powdery substance tested positive for heroin were sufficient to establish probable cause, although laboratory eventually found substance negative for heroin); *Pennington v. Hobson*, 719 F. Supp. 760, at 767-69 (S.D. Ind. 1989) (granted qualified immunity to arresting officers; probable cause to arrest existed where field test indicated powder was cocaine even though subsequent laboratory test identified powder as aspirin and record contains no evidence defendants were disingenuous in performing field test).

Here, there is no evidence in the record from which a jury could reasonably conclude that Deputy Burns or Deputy Blake recklessly disregarded information that the test results were unreliable or inaccurate. Deputy Burns testified that, at the time he tested the plant material he discovered in plaintiffs' trash, he had no knowledge that anything other than marijuana could test positive on a marijuana field test kit and that he was "not aware" of the possible occurrence of false positive test results. Deputy Blake's testimony on those issues is substantially the same. Moreover, Sheriff Denning testified that, since he came to the Johnson County Sheriff's Office in 1978, the Office has conducted "thousands" of field tests and the only false positive results of which he is aware are the results at issue in this case. There is no basis to conclude, then, that Deputy Burns or Deputy Blake should have known that the field test kits they were using tended to yield false positive results or that the particular test results they obtained in connection with this case were not reliable. To the extent plaintiffs suggest that Deputy Burns was reckless in his haste to apply for a warrant in light of the looming April 20, 2012 Operation Constant Gardener raids, there is no evidence that Deputy Burns, assuming he was rushed, failed to

follow his ordinary procedure when he sought the warrant.   Significantly, Deputy Burns testified that, regardless of the planned April 20 raids, he would not have sent the plant material to the lab for confirmation of the field test because, in April 2012, the Sheriff's Office standard practice concerning trash pulls was to obtain a warrant on the basis of field tests in light of the "freshness of the probable cause" unique to trash pulls.  According to Deputy Burns, he had no knowledge in April 2012 that anyone in the Sheriff's Office ever submitted material from a trash pull to the lab for testing.[4]  Based on the evidence in the record, then, no reasonable jury could conclude that Deputy Burns, at the time he applied for the warrant, had any particularized reason to doubt the accuracy of the two consecutive field test results that he and Deputy Blake obtained on the material from the plaintiffs' trash.  For these reasons, the court, in analyzing whether probable cause existed for the warrant, will not excise the statements concerning the two positive field test results.

In their submissions, plaintiffs identify three other alleged misrepresentations in Deputy Burns' warrant affidavit.  In paragraph 6 of the affidavit, Deputy Burns states that, on April 10, 2012, officers found "a sizable quantity (approximately 1 cup) of green vegetation which appeared to be wet marijuana plant material (leaves and stems)."  Plaintiffs challenge that portion of the statement in which Deputy Burns indicates that the substance "appeared to be wet marijuana" and contend that no reasonably competent officer would have believed that the substance "appeared to be" marijuana.  In support of their argument, plaintiffs assert that their expert, Mr. Bussell, opined that bits of fruit and flowers could be readily seen in the varieties of

---

[4] In light of this lawsuit, the Sheriff's Office has changed its policy and now requires deputies to send any suspected drug material found in a trash pull to the lab for confirmation before seeking a warrant.

tea leaves that he brewed and that Ms. Spangler, the lab analyst, indicated in her case notes in August 2012 that the substances found in plaintiffs' trash "macroscopically . . . did not appear to be marijuana." This evidence is not sufficient to show that Deputy Burns, at the time he drafted the affidavit, "entertained serious doubts" about the truth of his statement.

To begin, there is no evidence that the plant material looked the same in August 2012 when Ms. Spangler observed it as it did when it was thoroughly saturated in April 2012 when Deputy Burns observed it. There is also no evidence that Mr. Bussell necessarily brewed and observed the same tea blend that Deputy Burns discovered in plaintiffs' trash. Moreover, Deputy Burns readily admitted in his deposition that the plant material was "hard to identify" and that, while he never considered that the substance could be tea leaves because he had never in his life seen loose tea leaves, he did consider that the substance might be some type of consumable herb or vegetable. Because the material was thoroughly saturated and "processed," Deputy Burns testified that he "thought" it might have been processed for the extraction of THC. Deputy Burns further testified that, in light of his uncertainty, he brought the substance to his supervisor, Sergeant Reddin. Deputy Burns and Sergeant Reddin both testified that they unrolled some of the leaves and observed at least one serrated leaf, which heightened Deputy Burns' suspicion that the substance was marijuana. As explained by Deputy Burns, his suspicions were essentially confirmed—and he ruled out kitchen herbs or vegetables—once he tested the substance and obtained a positive result for the presence of THC. For these reasons, the evidence highlighted by plaintiffs is not sufficient to conclude that Deputy Burns, at the time he signed the warrant affidavit, seriously doubted whether the material "appeared to be wet marijuana." There is no basis, then, to excise this statement from the affidavit.

In paragraph 10 of the warrant application, Deputy Burns refers to the April 17, 2012 trash pull and states that one of the trash bags contained "approximately ¼ cup of saturated marijuana plant material (leaves and stems) which was consistent with the material" found on April 10, 2012.  Plaintiffs content that this statement was made with reckless disregard for the truth because Deputy Burns represented that the material "was in fact marijuana, not just something that looked like marijuana."   The court disagrees.  When read in the context of the entire affidavit, it is clear that Deputy Burns was not representing to the judge that the material was "in fact" marijuana, but that the material was presumed to be marijuana based on its appearance and the results of the field test.  Indeed, in paragraph 11 of the affidavit, Deputy Burns states that the test was "presumptive but not conclusive for the presence of marijuana," which undermines any suggestion that Deputy Burns was representing to the judge that the material was conclusively marijuana.  The court, then, will not remove this statement from the affidavit in assessing whether probable cause exists for the warrant.

Finally, plaintiffs challenge a statement made by Deputy Burns in paragraphs 7 and 11 of the affidavit—that the field test utilized by him (and the one used by Deputy Blake) "consists of reagents similar to those utilized by the Johnson County Criminalistics Laboratory to conduct its initial screening test for marijuana."  According to plaintiffs, this statement is untrue because the crime lab uses the KN reagent "for a completely different purpose—thin layer chromatography."  Plaintiffs have not demonstrated that Deputy Burns' statement is false.  Valerie Kamb, a crime lab supervisor, testified that Deputy Burns' statement was accurate and that the lab was using the KN reagent as part of its marijuana testing protocol at that time.  According to Ms. Kamb, the lab was not using the KN reagent "in a pouch form" like Deputy Burns had used in the field,

but in connection with a different type of initial screening called thin layer chromatography. Because the uncontroverted evidence demonstrates that the crime lab, at the time of Deputy Burns' statement, utilized the KN reagent as part of its screening test for marijuana, plaintiffs cannot make a substantial showing that the statement is false. The statement, then, is properly considered in assessing whether the warrant was based on probable cause.

*Omissions*

Plaintiffs have identified several omissions from Deputy Burns' affidavit and they contend that a judge would have wanted to know about the information that was withheld. In the first paragraph of the affidavit, Deputy Burns states that the Green Circle "sells hydroponic grow equipment and materials commonly used in the cultivation of marijuana" and that he knows that information from "personal past experience." Plaintiffs assert that Deputy Burns recklessly omitted from this paragraph that he had never been inside the Green Circle "and had little idea what it sold or whether, in fact, it bore any relationship to marijuana growing." While Deputy Burns testified that he had never been inside the store, the testimony referenced by plaintiff does not support the assertion that he had "little idea" about what was sold at the Green Circle. Deputy Burns testified that he had knowledge that the Green Circle sold lighting equipment, timers, grow mediums such as clay pellets, and nutrients and fertilizers. Plaintiffs direct the court to no evidence suggesting that Deputy Burns' assessment of what was sold at the Green Circle was inaccurate or that he otherwise lacked personal knowledge of what items were sold at the Green Circle. Thus, the fact that Deputy Burns did not assert in the affidavit that he had never been inside the Green Circle is of no consequence. Stated another way, no reasonable

21

person would believe that a judge would want to know, in deciding whether to sign the warrant, that Deputy Burns had never been inside the store. This, of course, is particularly true in light of the fact that Deputy Burns, in his affidavit, reported that the deputies had obtained positive field test results on two separate occasions, which independently established probable cause regardless of Mr. Harte's sighting at the Green Circle.[5]

Plaintiffs next highlight that the search warrant affidavit omits the fact that the "green vegetation" discovered in the trash was, more specifically, discovered in the kitchen trash. According to plaintiffs, a reasonable person who discovered the vegetation in the kitchen trash would have concluded that the vegetation was something discarded "from the kitchen" as opposed to marijuana—particularly when coupled with the fact that the vegetation lacked the characteristic odor of marijuana (another omission identified by plaintiffs).[6] But in the light of the two positive field test results obtained by the deputies, it is difficult to ascertain the relevance of the specific nature of the trash in which the plant material was discovered. Thus, even if Deputy Burns had included in his affidavit that the material was discovered in the

---

[5] In their response to defendants' facts, plaintiffs also suggest that Officer Burns should have included the "growth cycle" for marijuana in light of the fact that Mr. Harte was observed at the Green Circle nearly 8 months prior to the trash pulls. Plaintiffs highlight Sergeant Wingo's testimony that the growth cycle for marijuana is 60 to 90 days. There is no evidence that Officer Burns had any knowledge of the growth cycle for marijuana and, accordingly, he cannot have recklessly omitted that information. *See United States v. Comer*, 565 Fed. Appx. 729, 731-32 (10th Cir. 2014) (record did not support finding that investigator recklessly omitted informant's criminal history from warrant affidavit where there was no evidence that investigator had knowledge of informant's criminal history). Moreover, the omission is not material in light of the fact that the deputies had obtained positive results from field testing of very recently saturated and recently "processed" vegetation.

[6] In the court's view, there is nothing inherently unusual about discarding processed marijuana in the kitchen trash (as opposed to some other trash receptacle in a residence) and, for that reason, the fact that the vegetation was discovered in the kitchen trash is not material.

kitchen trash, that statement would not have defeated probable cause, which was independently established by virtue of the field tests.

Plaintiffs also contend that Deputy Burns recklessly omitted the fact that the plant material lacked the distinct odor of marijuana and was "hard to identify." It is undisputed that Deputy Burns, upon initially observing the saturated plant material, did not know whether the substance was marijuana. But because any uncertainty dissipated when he field tested the material and obtained a positive result, no reasonable officer would have included details about his initial uncertainties in the warrant application—those facts simply had no relevance once the tests came back positive. These facts, then, are not ones which would have made a difference to a judge. And plaintiffs' evidence does not permit any other conclusion. Plaintiffs' expert opines that a reasonable, trained narcotics officer would never have confused the distinct odor of marijuana with the "fruity and floral" fragrance of the brewed tea leaves. This opinion fails to controvert Deputy Burns' testimony—referenced by plaintiffs in their submissions—that he did not even attempt to smell the plant material because the smell of the trash itself was "overwhelming" and that he did not expect wet marijuana to have the distinct odor that he would associate with raw marijuana. According to Deputy Burns, wet marijuana, in his experience, has an "earthy" smell. Plaintiffs have directed the court to no evidence casting doubt on Deputy Burns' testimony. Thus, the fact that Deputy Burns did not disclose in the affidavit that the material "did not emit any odor consistent with marijuana"—even putting aside the fact that the positive field tests independently established probable cause in any event—is not information that a reasonable person would think that a judge would want to know in determining whether to sign the warrant under the circumstances described by Deputy Burns.

The same holds true with respect to plaintiffs' contention that Deputy Burns recklessly omitted from his affidavit that the plant material was "hard to identify."  Because any uncertainty that Deputy Burns had concerning the nature of the vegetation in the Hartes' trash was wiped away as soon as he obtained a positive field test, there is no basis to conclude that Deputy Burns, at the time he signed the affidavit, believed that the material was "hard to identify" or that he entertained any "serious doubts" about the nature of the material.  In other words, there was simply no reason to include those facts in light of the field test results and, because of those results, no judge would have cared that Deputy Burns was uncertain as to the nature of the substance upon his initial observation of it.  Again, plaintiffs' evidence does not demonstrate that the information should have been included.  It is undisputed that Deputy Burns initially considered that the substance might be an herb or vegetable and, in fact, he did disclose in the affidavit that he believed on April 3, 2012 that the material was "innocent plant material." Deputy Burns testified that, in light of his uncertainty, he and Sergeant Reddin unrolled some of the leaves and observed at least one serrated leaf, which heightened his suspicion that the substance could be marijuana.  As explained by Deputy Burns, his suspicions were essentially confirmed—and he ruled out kitchen herbs or vegetables—once he tested the substance and obtained a positive result for the presence of THC.  At the time he signed the warrant affidavit, then, the fact that the substance was initially "hard to identify" was not relevant—he had subsequently obtained two positive field test results.  For these reasons, plaintiffs have not established that Deputy Burns recklessly omitted from the affidavit that the substance was "hard to identify."

24

Plaintiffs further highlight that Deputy Burns omitted from his affidavit any mention of observing serrated leaves in the substance found in plaintiffs' trash.  Presumably, any mention of this fact by Deputy Burns would have served only to strengthen the case for probable cause.  To the extent plaintiffs mean to suggest that Deputy Burns and Sergeant Reddin lied in their depositions about observing serrated leaves, there is no evidentiary basis to support that suggestion except that the information was omitted from Deputy Burns' affidavit.  The nefarious inference that plaintiffs draw, however, is not reasonable for the same reasons Deputy Burns' other omissions do not change the probable cause calculus—Deputy Burns reasonably left out details about his observations that were not material after deputies obtained positive field test results on two separate occasions.  As explained earlier, there is no basis to conclude that Deputy Burns or Deputy Blake lied about obtaining those results or were otherwise reckless in reporting those results.  In the absence of such evidence, there is no basis to conclude that Deputy Burns lied about observing serrated leaves in the vegetation they found.

Finally, plaintiffs contend that Deputy Burns recklessly omitted from the affidavit that he lacked formal training in using the Lynn Peavey KN reagent field test that he used in April 2012 and that those particular field test kits are "known to yield false positives" at a very high rate in connection with common kitchen herbs, spices and caffeine.  Plaintiffs have failed to come forward with facts suggesting that Deputy Burns' failure to disclose his lack of "formal" training on the field test kit that he used was reckless.  The affidavit states that Deputy Burns had been employed as a deputy sheriff for 15 years at the time of the affidavit with more than 8 years of experience participating in narcotics investigations.  The affidavit reveals that Deputy Burns had extensive on-the-job experience as well as additional training in drug law enforcement and

investigations. Against this backdrop, there is nothing in the record to suggest that a judge would have wanted to know that Deputy Burns lacked "formal" training on the specific field test he used in April 2012. Moreover, the affidavit reflects that Deputy Blake performed the field test on the material discovered during the April 17, 2012 trash pull and plaintiffs do not identify any omissions with respect to Deputy Blake's training. In fact, the record, as highlighted in plaintiffs' submissions, reflects that Deputy Blake had used the Lynn Peavey KN reagent field test "hundreds" of times during his career and had been trained on the use of that test by a field training officer. For these reasons, too, if Deputy Burns had disclosed his lack of formal training, that information would not have altered the probable cause analysis.

While the court does not doubt that a judge would have wanted to know that the field test kits that Deputy Burns and Deputy Blake were using tended to yield false positive results "at a high rate," there is simply no evidence that Deputy Burns or Deputy Blake had any knowledge of that information. In fact, as plaintiffs point out in their submissions, Deputy Burns testified that, at the time he tested the plant material he discovered in plaintiffs' trash, he had no knowledge that anything other than marijuana could test positive on a marijuana field test kit and that he was "not aware" of the possible occurrence of false positive test results. Deputy Blake's testimony on those issues is substantially the same. Moreover, Sheriff Denning testified that, since he came to the Johnson County Sheriff's Office in 1978, the Office has conducted "thousands" of field tests and the only false positive results of which he is aware are the results at issue in this case. There is no basis to conclude, then, that Deputy Burns or Deputy Blake should have known that the field test kits they were using tended to yield false positive results. And even assuming that Deputy Burns or Deputy Blake should have known, as plaintiffs

suggest,[7] that a false positive is at least a theoretical possibility, plaintiffs have not shown that Deputy Burns recklessly omitted that information from the affidavit, where he clearly stated on two occasions that the rest result was "presumptive" but "not conclusive" for the presence of marijuana and neither Deputy Burns nor Deputy Blake had any particularized knowledge concerning the likelihood of obtaining a false positive under the circumstances presented.  *See Molina ex rel. Molina*, 325 F.3d at 971 (rejecting argument that officer should have discussed in the search warrant affidavit the fact that field tests were unreliable; plaintiffs presented no evidence that officer had reason to know that field tests were unreliable when he applied for the warrant).  For all of these reasons, then, plaintiffs cannot establish that Deputy Burns recklessly failed to disclose that the field test kit utilized by Deputy Burns and Deputy Blake tended to yield false positive results at a high rate.  *See United States v. Comer*, 565 Fed. Appx. 729, 731-32 (10th Cir. 2014) (record did not support finding that investigator recklessly omitted informant's criminal history from warrant affidavit where there was no evidence that investigator had knowledge of informant's criminal history).

Based on the totality of the circumstances, plaintiffs have not shown that the warrant lacked probable cause and, thus, defendants' search of plaintiffs' residence was lawful and no constitutional violation occurred.[8]   Summary judgment on qualified immunity grounds is

---

[7] Plaintiffs reference the testimony of lab analyst Valerie Lamb, who testified that it is "well known" that false positives "exist."

[8] Plaintiffs generally contend, without attacking any specific portion of the warrant affidavit, that the deputies improperly bypassed other avenues of establishing probable cause in their haste to create a "media spectacle" concerning Operation Constant Gardener.  These allegations fail to establish a knowing or reckless disregard for the truth.  *See Stonecipher*, 759 F.3d at 1142 ("[T]he failure to investigate a matter fully, to exhaust every possible lead, interview all potential witnesses, and accumulate overwhelming corroborative evidence rarely suggests a

appropriate in favor of defendants Blake, Burns, Cossairt, Denning, Denton, Farkes, Kilbey, Pfannenstiel, Reddin, Shoop, Smith, Vrabac and Wingo on plaintiffs' claims for unlawful search. *See Stonecipher*, 759 F.3d at 1145.[9]


B.     *Unlawful Seizure*

Plaintiffs further claim that, even if there was probable cause to initiate the search, probable cause evaporated during the course of the search such that the continued search and detention of plaintiffs was unlawful.  Specifically, plaintiffs contend it was unreasonable for officers to continue to search the residence once they discovered the hydroponic garden contained only tomato plants.  In support of their argument, plaintiffs highlight Deputy Shoop's testimony that the deputies knew "within the first 15 or 20 minutes" that they would not find "a massive grow operation."   Plaintiffs urge that any probable cause dissipated once deputies realized that the hydroponic garden contained only "scrawny tomato plants" but that deputies, in violation of plaintiffs' constitutional rights, continued to search for evidence of a dismantled grow operation and, then, "personal use" amounts of marijuana.  Defendants move for summary

---

knowing or reckless disregard for the truth.  To the contrary, it is generally considered to be token negligence at most."); *United States v. Fiscus*, 64 Fed. Appx. 157, 162 (10th Cir. 2003) (no Fourth Amendment violation for valid search regardless of officers' motivation in conducting the search).

[9]  In the absence of an underlying constitutional violation, plaintiffs' claims against any individual (such as defendants Denning and Wingo) who is alleged to have supervised, directed or set in motion the constitutional violation necessarily fail.  *See Gray v. University of Colo. Hosp. Auth.*, 672 F.3d 909, 918 n.7 (10th Cir. 2012) (no liability under section 1983 for failure to supervise without underlying constitutional violation); *Apodaca v. Rio Arriba County Sheriff's Dept.*, 905 F.2d 1445, 1447–48 (10th Cir. 1990) (claim under section 1983 for failure to train or supervise an officer requires a constitutional violation by the officer).

judgment on qualified immunity grounds.  Because plaintiffs have failed to establish a violation of law, defendants are entitled to summary judgment.

As explained earlier, probable cause existed for the search warrant such that deputies were permitted to search plaintiffs' residence for those items listed in the warrant.[10]  The warrant expressly authorized the deputies to search for "marijuana in all forms to include, but not limited to, marijuana plants and plant material, marijuana seeds, marijuana in any stages of growth and/or processing; drug paraphernalia used to cultivate and/or process marijuana to include, but not limited to, packaging material, trimmers, scales, dryers, and hanging systems, and drug paraphernalia used to introduce drugs into the body; and indicia of occupancy."[11]  Thus, while the deputies did not find a "massive" grow operation, they continued to search plaintiffs' residence for a total of almost two-and-one-half hours for evidence of "remnants" of a grow operation or evidence of personal use of marijuana.  According to Deputy Shoop, the hydroponic garden discovered in the basement by the deputies had several "empty spaces on the hydroponic spots, holes that did not have pots in them" such that the deputies expected,

---

[10] Plaintiffs suggest in their submissions that the deputies cannot rely on the warrant to justify their continued search because the deputies had not even read the warrant or the affidavit in support of the warrant.  Plaintiffs have not pointed to any case law establishing that the deputies—who undisputedly had been briefed that the search included marijuana in all forms—had an independent duty to read the warrant or affidavit.  *See Wigley v. City of Albuquerque*, 567 Fed. Appx. 606, 609-10 (10th Cir. 2014)

[11] Plaintiffs do not contend that the warrant was overbroad.  They contend, however, that the deputies exceeded the scope of the warrant because Deputy Blake testified that "[e]verybody was looking for any kind of criminal activity that was involved in the house."  When read in context, however, it is clear that Deputy Blake was not suggesting that agents were looking for criminal activity beyond activity related to the growing or use of marijuana.  Moreover, there is no evidence that any agent searched the home for any criminal conduct not related to marijuana.  Stated another way, there is no evidence that the deputies conducted a general exploratory search of plaintiffs' residence or searched plaintiffs' computers, telephones or mail, for example.

consistent with their experience, to find marijuana plants in some other state of processing somewhere else in the residence.  Deputy Shoop further testified that within 60 or 90 minutes, the deputies  were "fairly certain" that they were not going to find remnants of a grow operation but, because they were operating under the assumption that marijuana had been discovered in the trash, they continued to search the residence for evidence "of some kind of use of marijuana."  According to Deputy Shoop, once the deputies determined that no evidence of personal use marijuana existed in the residence, they executed the warrant return and exited the residence.

In support of their claim, plaintiffs analogize the facts here to those presented in *Maresca v. Bernalillo County*, 804 F.3d 1301 (10th Cir. 2015), in which the Circuit held that the plaintiffs were entitled to summary judgment against a deputy for unlawful arrest because they were arrested without probable cause due to the deputy's "unreasonable mistake" of believing that the plaintiffs' vehicle was stolen. *Id*. at 1310.  According to the Circuit, the deputy unreasonably failed to use "readily available exculpatory evidence" (including the computer screen in her patrol vehicle evidencing that the description of the stolen car did not match the plaintiffs' vehicle in any respect) demonstrating that probable cause to arrest the plaintiffs did not exist. *Id*. at 1310-11.  Plaintiffs here contend that the deputies ignored "readily available exculpatory evidence" that plaintiffs were "law-abiding citizens" such that any search beyond the hydroponic garden in the basement was unreasonable.

*Maresca* plainly has no application to the facts here.  There is no evidence that the deputies made any "unreasonable mistakes" in connection with the search of plaintiffs' residence.  They had permission to search the residence for "marijuana in all forms" based on a

warrant for which there was probable cause.  Nothing they encountered inside the residence could reasonably be considered "exculpatory evidence."  In fact, deputies found evidence of a hydroponic garden and empty spots that might reasonably have held marijuana plants. Considering their belief (and there is no evidence that the belief was not honest or reasonable) that marijuana had been discovered in plaintiffs' trash, the court cannot say that the deputies acted unreasonably by searching the residence for two-and-one-half hours.  The fact that the search ultimately did not uncover marijuana does not mean that probable cause to search for marijuana necessarily dissipated at some point during the search.

In that regard, the court finds the Circuit's decision in *Lawmaster v. Ward*, 125 F.3d 1341 (10th Cir. 1997), particularly instructive.  In that case, federal agents, based on information from a confidential informant that the plaintiff owned an unregistered machine gun, obtained a search warrant authorizing a search of the plaintiff's home for the unregistered machine gun; any other firearms required to be registered with the Bureau of Alcohol, Tobacco and Firearms; any machine gun parts; any indicia of occupancy; and any documents or property referring to the purchase, ownership, maintenance or transfer of any firearms required to be registered under federal law.  *Id.* at 1344.  Due to safety concerns, the agents searched plaintiffs' residence while it was unoccupied.  *Id.*  Pertinent to the issue before this court, the agents discovered in a gun vault several firearms including the specific firearm matching the informant's description but concluded that none of the firearms were machine guns.  *Id.* at 1345.  Nothing was seized.  *Id.* The plaintiff filed a *Bivens* action alleging, among other things, that the agents violated his Fourth Amendment rights based on their unreasonable execution of the search.  *Id.* at 1347-48. The agents moved for summary judgment based on qualified immunity.  *Id.* at 1347-48.

In support of his Fourth Amendment claim, the plaintiff argued that once the agents realized that the gun described in the warrant was not an illegal machine gun, the agents "should have immediately halted their search" and unreasonably continued to search the plaintiff's home. *Id*. at 1348. The Circuit disagreed and held that the agents did not violate the Fourth Amendment by continuing to search the home after discovering that the specific firearm was not an illegal machine gun. *Id*. at 1348-49. As explained by the Circuit:

> As we have stated, probable cause existed permitting the Agents to search Mr. Lawmaster's home for the objects listed in the warrant. Whether evidence of a crime is actually found in the home is irrelevant to the issue of whether probable cause existed to search. Here, the Agents did not act unreasonably in continuing their search even after discovering the first Colt AR–15 .233 caliber gun they found was not an illegal machine gun. The illegal gun could have been hidden somewhere else in the house. We hold the Agents did not act unreasonably, and did not violate Mr. Lawmaster's Fourth Amendment right by continuing to search after discovering the Colt AR–15 .233 caliber gun was not an illegal machine gun.

*Id*. at 1348-49. Similarly, the deputies here did not act unreasonably by continuing to search for marijuana—as permitted by the language of the warrant—after they discovered that the hydroponic garden did not contain marijuana plants. To be sure, marijuana could have been virtually anywhere else in the residence. Plaintiffs have pointed to no evidence sufficient to "undo the preexisting probable cause calculus." *Hernandez v. Story*, 459 Fed. Appx. 697, 699 (10th Cir. Jan. 25, 2012) (rejecting argument that probable cause dissipated as investigation progressed where the plaintiff showed, at most, that additional facts "possibly" negated preexisting probable cause).

Finally, even assuming that probable cause dissipated at some point during the deputies' search of plaintiffs' residence, it is "far from clear that every reasonable officer . . . would have thought so." *Id*. Plaintiffs have not directed the court to any case law clearly indicating that the

lack of probable cause in this case was "beyond debate." *Id*. at 700 (citing *Ashcroft v. al–Kidd*, ––– U.S. –––, 131 S. Ct. 2074, 2083 (2011)).   Because plaintiffs have not cleared qualified immunity's second hurdle, summary judgment is appropriate regardless of whether plaintiffs have established a constitutional violation.   *See id*. (at second step, plaintiff must prove that officers "clearly lacked probable cause" to continue search; plaintiff cannot rely on general Fourth Amendment cases concerning the need for probable cause).

## C.   *Excessive Force*

In the pretrial order, Plaintiff's excessive force claim is asserted under the Fourth and Fourteenth Amendments.   In their summary judgment submissions, however, plaintiffs' excessive force claim is asserted only under the Fourth Amendment.   The court, then, evaluates plaintiffs' excessive force claim under the Fourth Amendment objective reasonableness standard.   *See Estate of Booker v. Gomez*, 745 F.3d 405, 419 (10th Cir. 2014) (determining which amendment applies to an allegation of excessive force requires consideration of where the plaintiff finds himself in the criminal justice system; any force leading up to and including arrest is actionable under the Fourth Amendment, while the Fourteenth Amendment governs any claim of excessive force brought by a pretrial detainee).

Under the objective reasonableness standard set forth in *Graham v. Connor*, 490 U.S. 386 (1989), "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id*. at 397.   "Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some

degree of physical coercion or threat thereof to effect it." *Id.* at 396. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* Relevant factors include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

Viewed in the light most favorable to plaintiffs, the evidence demonstrates that seven deputies were dispatched to execute the search warrant on plaintiffs' residence. According to plaintiffs' evidence, one of the deputies was dressed in khaki pants and a sweater; one was dressed in a "typical police uniform" and the rest were wearing thick, black bulletproof vests. It is not disputed that these deputies were wearing black t-shirts marked with the word "SHERIFF" in white lettering on the back. While the deputies appeared to plaintiffs to constitute a "tactical team," the deputies were not wearing helmets, hoods, kneepads or camouflaged clothing. Each deputy carried a Glock and one deputy also carried an AR-15 rifle. Upon arriving at plaintiffs' residence, two of the seven deputies went to the back of plaintiffs' residence and the remaining five deputies approached the front door of the home. They knocked on the door so loudly that the walls of the house "rattled" and, as soon as Mr. Harte opened the front door, those five deputies flooded the foyer of the residence. Plaintiffs' evidence reflects that four deputies had their Glocks drawn and held at the low-ready position and that Deputy

Kilbey had an AR-15 drawn and at the low-ready position.  Deputies commanded Mr. Harte to lie on the floor with his hands behind his head and he responded immediately without resistance. Mrs. Harte avers that when she arrived at the staircase from the upstairs of the home, she observed a deputy holding an assault rifle while standing over her husband.

Within minutes, the deputies had secured the home and the two deputies who had gone to the back of the house joined the other deputies in the foyer.  Plaintiffs were moved to the living room, where they were detained for the duration of the search "under armed guard."  Plaintiffs do not contend that the assault rifle was displayed at any point after the initial entry.  While they were detained in the living room, plaintiffs had to ask permission to use the restroom; to reach for their phones and to use their phones; and to provide gaming devices to their children.  While plaintiffs do not contend that any officer ever touched them, threatened them or pointed a weapon at them, Mrs. Harte avers that "[i]t was clear if we did not comply with every command that these officers were prepared to use the multitude of firearms available to them."  According to plaintiffs, the officers' show of force was "overwhelming" and far greater than what was necessary under the circumstances.

In support of their argument, plaintiffs rely on the Tenth Circuit's unpublished decision in *Ealum v. Schirard*, 46 Fed. Appx. 587 (10th Cir. 2002).  The facts in that case, however, readily distinguish it from the facts presented here.  In *Ealum*, officers entered a residence occupied by a grandmother and four minor children.  *Id.* at 589-90.  The officers did not have a warrant.  *Id.* at 589.  The facts alleged by the plaintiffs reflected that one officer pushed a 12-year-old child to the floor and held him there with his knee and, later, physically restrained that child on the couch; another officer "trained his firearm" on a six-year-old child; the officers

"kicked" a puppy from the couch; and that officers continuously pointed their weapons around the residence. *Id*. at 589-90. The officers moved for summary judgment on qualified immunity grounds as to the plaintiffs' excessive force claim and the district court denied that motion. *Id*. at 592-93. On appeal, the Circuit affirmed the district court's decision in the absence of any existing grounds to justify the officers' conduct. *Id*. at 592-93. By sharp contrast, it is undisputed that the deputies in this case, who entered the home on a valid warrant, did not point their weapons at anyone at any time and did not touch anyone at any time. And unlike the facts described in *Ealum*, plaintiffs in this case were not "herded" into the living room "at gunpoint." *See id*. at 592. *Ealum*, then, is not persuasive authority to the court in analyzing whether the officers' conduct was unreasonable.

Plaintiffs also direct the court to *Cortez v. McCauley*, 478 F.3d 1108 (10th Cir. 2007) in support of their excessive force claim. Like *Ealum*, the *Cortez* case presents significant facts not present here. In *Cortez*, officers executed a warrantless search of a residence in the middle of the night after receiving an allegation of child molestation levied against the male occupant of the residence, Rick Cortez. *Id*. at 1112-13. Despite the fact that Mr. Cortez's wife, Tina Cortez, was not the target of any investigation, officers entered her home in the middle of the night without a warrant; seized her by the arm and physically separated her from the telephone that she was using in an attempt to make a call; physically escorted her from the house; took the keys to the house and locked her out of the house; and placed her in the locked back seat of a patrol car. *Id*. at 1113, 1130.

The Tenth Circuit held that Tina Cortez alleged a constitutional violation concerning excessive force sufficient to survive summary judgment. *Id*. at 1130. According to the Circuit,

36

no evidence suggested that a reasonable officer would suspect that Mrs. Cortez posed a threat in that she was unarmed, gave no indication of flight, and was never the target of the investigation. *See id.* In so concluding, the Circuit focused on the "extra force" used against Mrs. Cortez beyond holding her arm—escorting her outside in the middle of the night and keeping her in a locked patrol car for nearly an hour. *See id.* at 1130-31. The facts and circumstances confronting the deputies in this case are substantially different from those confronting the officers in *Cortez.* The deputies here entered plaintiffs' home on a valid narcotics warrant during the day and they were not targeting one specific individual. Moreover, the officers' use of force in *Cortez* was much different than that utilized here—deputies in this case never physically touched any of the plaintiffs and never removed them from the home or locked them in a patrol car or any other secure location. *Cortez,* then, does not advance plaintiffs' claim.

Putting aside plaintiffs' cases, then, the court finds it most helpful to separate plaintiffs' claim into its distinct parts—the decision to employ a "tactical team"[12] to execute the search warrant; the conduct of the tactical team at the time of the initial entry; and the detaining of plaintiffs in the living room "under armed guard" for the duration of the search. *See Ealum*, 46 Fed. Appx. at 594-95 (the decision to use SWAT team and the conduct of SWAT team once inside residence are "better analyzed separately" for purposes of excessive force claim). In terms of the decision to use a SWAT-style team to execute the warrant, plaintiffs have not shown that the decision was an unreasonable one. In *Holland ex rel. Overdorff v. Harrington*,

---

[12] While defendants urge that the deputies executing the warrant were not members of a special tactical team, the evidence viewed in the light most favorable to plaintiffs is sufficient to permit a reasonable jury to conclude that the group of deputies executing the search constituted a special unit or team as opposed to, for example, a group of patrol officers.

268 F.3d 1179, 1188 (10th Cir. 2001), the Tenth Circuit analyzed whether the decision to use a SWAT team to accomplish a "dynamic entry" in the context of a search of a residence implicated Fourth Amendment concerns. *Id*. at 1189. As the *Holland* court recognized, "[t]he decision to deploy a SWAT team to execute a search warrant involves the decision to make an overwhelming show of force—force far greater than normally applied in police encounters with citizens." *Id*. at 1190. Because the reasonableness of a search and seizure depends not only on when a seizure is made, but also how it is carried out, "the decision to deploy a SWAT team to execute a warrant must be 'reasonable' because it largely determines how the seizure is carried out, thereby determining the extent of the intrusion on the individual's Fourth Amendment interests." *Id.* (citation omitted). The Circuit in *Holland* ultimately determined that the force invoked by the decision to deploy a SWAT team to effectuate a dynamic entry was not excessive where the deputies executing a misdemeanor arrest warrant planned to encounter several persons in addition to the suspect and believed there would be firearms in the residence. *Id*. at 1191. In that case, the Circuit upheld the decision to use a SWAT team as reasonable despite evidence that the seven members of the team executed the warrant at night and the members were wearing full camouflage clothing with no identifying markings and hoods showing only their eyes. *Id*. at 1183, 1197.

In *Whitewater v. Goss*, 192 Fed. Appx. 794 (10th Cir. 2006), the Circuit, albeit in an unpublished decision, extended *Holland* and held that the use of a SWAT team—even under a blanket rule requiring the deployment of a SWAT team for all searches in narcotics cases—did not constitute excessive force in the absence of evidence that the decisionmaker knew the team would use excessive force, intended to cause harm, or instructed the team to use excessive force.

*Id*. at 797.   In that case, thirteen members of the County's SWAT team, dressed in full camouflage, "stormed" the residence of a 61-year-old man at daybreak and the only identified basis for the use of the SWAT team was the "potential presence of marijuana" at the residence. *Id*. at 799-800.   Nonetheless, the Circuit affirmed the district court's grant of summary judgment on qualified immunity grounds and held that the use of the SWAT team in itself did not violate the plaintiffs' constitutional rights.  *Id*. at 797; *accord Ealum*, 46 Fed. Appx. at 595 (decision to use SWAT team not unreasonable even though deputy who made the decision knew that children were in the residence; deputy was aware that there was an adult in the residence and that "some years earlier" there were firearms in the residence).

Turning back to this case, the evidence viewed in the light most favorable to plaintiffs reflects that the decision to send five armed and identified deputies wearing bulletproof vests to execute a search warrant during the day was not in and of itself unreasonable.  *Whitewater* appears to permit the use of SWAT teams in executing any search warrant in a narcotics case absent specific evidence that the decisionmakers knew that the team would use excessive force, instructed the team to use excessive force or intended to cause harm.  There is no such evidence in the record before the court.  Moreover, the Circuit in *Whitewater* upheld as reasonable the deployment of a SWAT team (based, as here, on the potential presence of marijuana) that was certainly more intimidating than the team deployed in this case—the team consisted of 13 members dressed in full camouflage.   While *Whitewater* is not a published decision, it nonetheless leads this court to believe that the Circuit, if faced with the facts presented here, would conclude that the decision to the use a SWAT-style team was not a violation of plaintiffs' Fourth Amendment rights.  Even the arguably more restrictive *Holland* case seems to assume

that it is reasonable to send armed special agents (as opposed to patrol officers) during the execution of a narcotics warrant.  And because *Holland* approved the use of a team at night wearing full camouflage, no identifying markings and hoods showing only their eyes, the Circuit surely would approve the use of the team in this case which, again, was much less intimidating than the one utilized in *Holland*.  In light of the foregoing, the court concludes that the use of a SWAT-style team in this case was not excessive.  *See Santistevan v. City of Colorado Springs*, 983 F. Supp. 2d 1295, 1318-19 (D. Colo. 2013) ("The Court is aware of, and Plaintiff cites, no cases in which the Tenth Circuit has found that the deployment of a SWAT team to execute a search warrant amounted to excessive force.").

The court turns, then, to the conduct of the tactical team upon initial entry into plaintiffs' residence.  Because Mr. Harte opened the door for the deputies, the deputies did not break down the door; they simply "flooded" the foyer upon entry with guns drawn at the low-ready position. Plaintiffs concede that the situation was "secure" within minutes and that, during that time, no deputies pointed a weapon at plaintiffs or otherwise touched plaintiffs.  In analyzing these facts, *Holland* is again instructive.  In *Holland*, the Circuit recognized that the "display of weapons and the pointing of firearms directly at persons inescapably involves the immediate threat of deadly force" and may violate the Fourth Amendment if done excessively or unreasonably.  268 F.3d at 1192-93.  As explained by the Circuit:

> Where a person has submitted to the officers' show of force without resistance, and where an officer has no reasonable cause to believe that person poses a danger to the officer or to others, it may be excessive or unreasonable to continue to aim a loaded firearm directly at that person, in contrast to simply holding the weapon in a fashion ready for immediate use.

*Id*. at 1193.

Here, it is undisputed that plaintiffs complied immediately with the deputies' instructions. At that point, it would have been unreasonable for deputies to point their weapons at plaintiffs or otherwise escalate the situation. But there is simply no evidence that the deputies' conduct at that point was unreasonable. Plaintiffs concede that no deputy ever pointed a weapon at any of the plaintiffs or ever touched any of the plaintiffs. The deputies simply continued to hold their weapons at the low-ready position. Because *Holland* suggests that officers may hold their weapons "in a fashion ready for immediate use" even after a person submits to the officers' authority, *Holland* certainly supports the conclusion that the deputies here were not unreasonable in maintaining their weapons at the low-ready position for the "minutes" it took to secure the residence. The deputies, then, are entitled to qualified immunity on this aspect of plaintiffs' excessive force claim.

Within minutes of the deputies' initial entry, plaintiffs were directed to sit on the couch in the living room "with an armed officer standing guard" over them for the remainder of the two-and-a-half hour search. Plaintiffs concede that they had some freedom of movement during this time and were not physically restrained in any way. Again, there is no evidence or allegation that any officer ever directed a weapon at any of the plaintiffs. Rather, plaintiffs' evidence demonstrates that one or two deputies remained in the living room with plaintiffs at all times and those deputies were armed. The record is not clear whether these deputies' weapons were holstered during this time or whether the deputies maintained their weapons at the low-ready position. Nonetheless, because the deputies had a warrant to search plaintiffs' residence, then the deputies were plainly permitted to detain plaintiffs and were authorized to use "reasonable force" to effectuate that detention. *See Muehler v. Mena*, 544 U.S. 93, 99-100 (2005). In

*Muehler*, during a SWAT team raid of 1363 Patricia Avenue, officers handcuffed and detained Ms. Mena, who was found asleep in her bed at that location.  The Court held Ms. Mena's detention for the duration of the two- to three-hour search was reasonable under *Summers* because a warrant existed to search 1363 Patricia Avenue and she was an occupant of that address at the time of the search.  Id. at 99-100.  Pertinent here, the Court held that the officers' use of force in handcuffing Ms. Pena for the duration of the search was reasonable.  *Id*. at 100.  Clearly, the use of force in this case was both minimal and reasonable.  Unlike the facts in Mena, plaintiffs were never handcuffed and their freedom of movement was not fully restricted.  The mere fact that the deputies in the living room were armed is not sufficient to render the use of force unreasonable under these circumstances.  *See Santistevan*, 983 F. Supp. 2d at 1321-22 (no excessive force where evidence reflected that officer stood next to the plaintiff and "guarded" her with his gun; officer never pointed weapon at the plaintiff; he was simply armed at the time.

In sum, the court concludes based on the uncontroverted facts that the force utilized by the individual defendants on the scene was objectively reasonable and not excessive.  Plaintiffs, then, have not established a constitutional violation and the individual defendants are entitled to qualified immunity on plaintiffs' excessive force claim.  Summary judgment on this claim is granted.

*D.*    Monell *Claim*

Because there was no underlying constitutional violation by any of the deputies, neither the Board of Commissioners of Johnson County nor Sheriff Denning may be held liable under §

1983.  *See Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1317-18 (10th Cir. 2002) (citing *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993)).  Summary judgment is required, then, on plaintiffs' claim that the Board of Commissioners and Sheriff Denning are liable under *Monell v. Dep't of Social Services*, 436 U.S. 658 (1978).

## IV.    State Law Claims

With respect to plaintiffs' Kansas state-law claims, plaintiffs have invoked the court's supplemental jurisdiction under 28 U.S.C. § 1367 on the grounds that plaintiffs' federal claims and their state law claims derive from a common nucleus of operative fact.  While supplemental jurisdiction clearly exists in this case, the court may decline to exercise supplemental jurisdiction where, as here, it has dismissed all claims over which it has original jurisdiction. *See* 28 U.S.C. § 1367(c).  The exercise of jurisdiction under § 1367 is a matter for the court's discretion, and the court is charged to act "in the manner that best serves the principles of economy, convenience, fairness and comity" that underlie supplemental jurisdiction.  *See City of Chicago v. International Coll. of Surgeons*, 522 U.S. 156, 172-73 (1997).  Because none of the parties have asked the court to decline to exercise supplemental jurisdiction, and because the parties have completed discovery and the trial of this matter is set for just over two months away, the court concludes that exercising supplemental jurisdiction in this case will further the interests of economy and convenience.   The court, then, proceeds to consider the parties' arguments concerning plaintiffs' state law claims.

A.     *Trespass*

Plaintiffs assert a claim of trespass against all defendants except defendant Wingo. Trespass is the unauthorized entry upon the land of another. *See Robinson v. Armstrong*, 118 P.2d 503, 505 (1941). Because the alleged trespass in this case occurred during the execution of a valid warrant supported by probable cause, and because there is no evidence that the deputies exceeded the scope of the warrant, there is simply no trespass by the defendants. Summary judgment is granted in favor of the defendants on this claim. *See Restatement (Second) of Torts* § 210 cmt. h (1965) (one who enters land in the possession of another pursuant to the authority of a valid search warrant is privileged to enter the land for the purpose of executing the warrant).

## B. Assault

Plaintiffs assert a claim of assault against the individual defendants based on the conduct of the deputies upon initial entry into plaintiffs' residence and once plaintiffs had been moved to their living room for the duration of the search. However, conduct that would otherwise subject a person to liability in tort for assault does not constitute tortious conduct if the actor is privileged to engage in such conduct. *See Restatement (Second) of Torts* § 10 (1965). An officer executing a valid search warrant is privileged to use reasonable force to effectuate the detention of the occupants of the residence. *Muehler v. Mena*, 544 U.S. 93 (2005); *Michigan v. Summers*, 452 U.S. 692 (1981). Thus, because the deputies in this case did not act unreasonably or excessively for purposes of the Fourth Amendment when executing the warrant, the deputies cannot be held liable for assault under Kansas law. *See Dauffenbach v. City of Wichita*, 657 P.2d 582 (Kan. App. 1983) (under state tort law, officer making arrest has the right to use reasonable force to effect the arrest) (citing *Restatement (Second) of Torts* 132 cmt. a (1965)

(officer not liable in tort unless force used is excessive)).   Summary judgment in favor of defendants is granted on plaintiffs' assault claim.

C.   *False Arrest*

Plaintiffs assert a common law claim against defendants for false arrest or false imprisonment under Kansas law.   False imprisonment or false arrest is "the restraint of the personal freedom of an individual without legal excuse by any words, acts, threats, or personal violence that under the circumstances the one being restrained fears to disregard." *Mendoza v. Reno County*, 681 P.2d 676, 678 (Kan. 1984).   Defendants move for summary judgment on this claim on the grounds that they are legally excused for restraining plaintiffs' personal freedom in light of the lawful search of plaintiffs' residence pursuant to the warrant.   Defendants are clearly correct and summary judgment in their favor is granted. *Michigan v. Summers*, 452 U.S. 692, 702-03 (1981) (detention during execution of search warrant is justified); *Muehler v. Mena*, 544 U.S. 93, 99 (2005) (officer's authority to detain incident to a search is categorical); *Porter v. Stormont–Vail Hosp.*, 621 P.2d 411, 416 (1980) (any imprisonment arising from execution of valid warrant does not constitute false imprisonment under Kanas law).

D.   *Abuse of Process*

Plaintiffs also assert abuse of process claims against defendants.   In Kansas, the elements of an abuse of process claim are a knowingly illegal or improper use of the process done for the purpose of harassing or causing hardship which results in damage to the plaintiff. *McShares, Inc. v. Barry*, 970 P.2d 1005, 1015 (Kan. 1998) (citing *Porter v. Stormont–Vail Hosp.*, 621 P.2d

45

411 (1980) (citations and quotations omitted)); PIK—Civil 4th 127.80.   As noted in the comments to the pattern instruction, if the act of the prosecutor is in itself regular, the motive, ulterior or otherwise, is immaterial.  *See* PIK—Civil 4th 127.80, cmt (quoting *Porter*, 621 P.2d 411 (1980)).   In their submissions, plaintiffs contend that defendants are liable for abuse of process because they applied for the warrant solely to support their media campaign and their scheduled April 20, 2012 press event.

In support of their argument, plaintiffs contend that defendants knew that a search of plaintiffs' home would not uncover evidence of criminal activity and yet they obtained the warrant based on signification omissions and misrepresentations in the warrant affidavit.  As explained above, plaintiffs have not made the requisite showing that the affidavit contained material misrepresentations or omissions.  Because the warrant was based on probable cause, any additional motive the deputies may have had in pursuing the warrant is not material.  *See id.* Moreover, even assuming the deputies were motivated solely by the Sheriff's Office media campaign and its efforts related to Operation Constant Gardener, plaintiffs nonetheless must point to an irregular or improper act.  *See Porter*, 621 P.2d at 416 (abuse of process claim requires both an ulterior purpose and an irregular or improper act).  Plaintiffs have not done so. Finally, plaintiffs do not suggest or come forward with evidence that defendants, even assuming they were motived by the Sheriff's Office media campaign, pursued the warrant or executed the search to harass or cause hardship to plaintiffs.  Summary judgment on their abuse of process claims, then, is appropriate.

E.      *Intentional Infliction of Emotional Distress*

In the pretrial order, plaintiffs allege that all defendants, except defendant Wingo, intentionally caused plaintiffs severe emotional distress.  To establish a cause of action for intentional infliction of emotional distress (or outrage) under Kansas law, a plaintiff must show that the conduct of the defendant was intentional or in reckless disregard of the plaintiff; the conduct was extreme and outrageous; a causal connection exists between the defendant's conduct and the plaintiff's mental distress; and the plaintiff's mental distress is extreme and severe.  *Roberts v. Saylor*, 637 P.2d 1175, 1179 (Kan. 1981).  As explained by the Kansas Supreme Court in *Roberts*, liability for the tort of outrage "may be found only in those cases where the conduct has been so outrageous in character, and so extreme in degree, as to be beyond the bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Id*.

Based on the court's conclusions that no constitutional violations occurred in this case and that the individual defendants' conduct in searching and effecting the search of plaintiffs' residence was lawful and reasonable for Fourth Amendment purposes, it would be incongruous for the court to find that the same conduct amounted to an extraordinary transgression of the bounds of decency so as to give rise to an intentional infliction of emotional distress claim.  The court does not doubt that the events of April 20, 2012 were upsetting to plaintiffs, but no reasonable jury could conclude that any defendant's conduct was utterly intolerable in a civilized society as to require the law to intervene.  All defendants are entitled to summary judgment on the merits of this claim.

F.     *False Light*

Plaintiffs' final claim is that defendants placed plaintiffs before the public in a false light by widely reporting through local news outlets the collective results of Operation Constant Gardner II without clarifying that at least one search did not uncover any contraband. According to plaintiffs, defendants' failure to clarify that at least one search did not uncover any criminal activity led plaintiffs' neighbors who had seen the raid at plaintiffs' home to assume that plaintiffs' residence in fact contained marijuana or other contraband. Kansas law recognizes a cause of action for false light invasion of privacy. *See Dominguez v. Davidson*, 974 P.2d 112, 121 (Kan. 1999). As explained in the Restatement (Second) of Torts, one who "gives publicity" to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy if:

> (a) the false light in which the other was placed would be highly offensive to a reasonable person, and

> (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

Restatement (Second) of Torts § 652E (1977); *Dominguez*, 974 P.2d at 121 (citing *Rinsley v. Frydman*, 559 P.2d 334 (1977)). For purposes of a false light claim, "publicity" means "that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." *Dominguez*, 974 P.2d at 121 (quoting *Ali v. Douglas Cable Communications*, 929 F. Supp. 1362, 1383 (D. Kan. 1996)). A communication to a small group of persons is not an invasion of privacy. *See Restatement (Second) of Torts* § 652D cmt. a (publicity means that the communication reaches or is sure to reach the public; it is not an invasion of privacy to communicate a fact about the plaintiff to a single person or even a small group of persons).

48

Defendants move for summary judgment on this claim on the grounds that plaintiffs have not come forward with evidence of "publicity" sufficient to permit a reasonable jury to return a verdict in their favor. As explained by defendants, plaintiffs' publicity theory does not focus on those people who saw the local news coverage of the April 20, 2012 drug raids. It is undisputed that the news outlets did not mention plaintiffs by name, address or even neighborhood. And unlike some other residences, plaintiffs' residence was not depicted on the news. At most, the news agencies reported that drug raids had occurred "in good neighborhoods" in places like "Leawood, Kansas" at the homes of "average Johnson County families." It is undisputed, then, that plaintiffs were not placed before the general news-viewing public in connection with coverage of the April 20, 2012 raids. Rather, plaintiffs' publicity theory focuses, as it must, exclusively on those neighbors who saw the raid unfold at plaintiffs' residence and, thereafter, saw the news coverage of the raids, leaving the implication that contraband had been discovered at plaintiffs' residence. According to defendants, there is no evidence in the record as to how many neighbors saw both the raid and the news coverage and, even assuming that all of plaintiffs' neighbors saw both the raid and subsequent news coverage, such evidence does not constitute widespread disclosure for purposes of maintaining a false light publicity claim.

In support of their claim and, more specifically, the "publicity" element of their claim, plaintiffs rely on *Watson v. City of Kansas City*, 185 F. Supp. 2d 1191 (D. Kan. 2001). In *Watson*, the court, examining the pleadings in the context of a Rule 12(b)(6) motion, held that the plaintiffs had alleged facts sufficient to survive a motion to dismiss their false light claim. *Id*. at 1209-10. Specifically, the plaintiffs alleged that the defendants executed search warrants at their residence on two separate dates; that the defendants were on their property on both dates

for extended periods of time; and that, on both occasions, a "crowd of gawking people standing at locations across the street, down the street, and driving by" observed the defendants' conduct. *Id.* at 1209.  The plaintiffs further alleged that they lived on a "highly traveled street." *Id.*

As plaintiffs acknowledge, *Watson* is of course readily distinguishable because of the procedural context of that case—a Rule 12(b)(6) motion as opposed to a summary judgment motion.  But even the allegations in *Watson* are not present here.  Plaintiffs come forward with no evidence that a "crowd" of neighbors on their cul-de-sac or in their neighborhood witnessed the raid; no evidence concerning whether other non-neighboring individuals witnessed the raid; and no evidence that their street was highly traveled.  In fact, there is no evidence in the record concerning the approximate number of neighbors who witnessed the raid, let alone evidence concerning the number of neighbors who witnessed the raid and thereafter viewed the news coverage of the raid.  In such circumstances, defendants are correct that no reasonable jury could conclude that defendants "gave publicity" to a matter concerning plaintiffs that placed them in a false light.  *See Smith-Utter v. Kroger Co*., 2009 WL 790183, at *5 (D. Kan. Mar. 24, 2009) (summary judgment required in favor of defendants on the plaintiff's false light claim even where plaintiff was wrongly accused of presenting stolen check at grocery store; "even if dozens of people" saw the arrest, not widespread disclosure for purposes of publicity); *Hunter v. The Buckle, Inc*., 488 F. Supp. 2d 1157, 1179-80 (D. Kan. May 29, 2007) (evidence that "possibly more than twenty people" saw the plaintiffs handcuffed and paraded out of store does not constitute widespread communication for purposes of false light publicity claim; summary judgment granted in favor of defendants); *Green v. City of Wichita*, 47 F. Supp. 2d 1273, 1278-79 (D. Kan. 1999) (summary judgment granted on false light claim where the defendants, in

enforcing City's housing code, placed placards on plaintiffs' rental properties but only a "small handful" of people saw defendants entering plaintiffs' property).  Summary judgment in favor of defendants is appropriate on this claim.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Jim Wingo's motion for summary judgment (doc. 281) is **granted**; defendants Edward Blake, Mark Burns, James Cossairt, Frank Denning, Nate Denton, Christopher Farkes, Tyson Kilbey; Michael Pfannenstiel, Thomas Reddin, Larry Shoop, Lucky Smith, Laura Vrabec and the Johnson County, Kansas Board of Commissioners' motion for summary judgment (doc. 285) is **granted**; and plaintiffs' motion to exclude or limit certain opinion testimony (doc. 287) is **moot**.

**IT IS SO ORDERED.**

Dated this 18th day of December, 2015, at Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge

51