# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

Adlynn K. Harte et al.,

    **Plaintiffs,**

v.             **Case No. 13-2586-JWL**

Board of Commissioners of the
County of Johnson County, Kansas et al.,

    **Defendants.**

## MEMORANDUM & ORDER

In April 2012, law enforcement officials from the Johnson County, Kansas Sheriff's Office obtained a search warrant to search plaintiffs' home for marijuana. That warrant was issued based on certain facts set forth in an underlying affidavit, including that plaintiff Robert Harte had made a purchase at a local hydroponic store and that wet, vegetative material subsequently obtained from plaintiffs' trash on two occasions field-tested positive for marijuana. On April 20, 2012, law enforcement officials executed the warrant, searched plaintiffs' home and detained plaintiffs for the duration of the search. No evidence of marijuana in any form was found during the search.

Thereafter, plaintiffs filed this lawsuit against the Board of County Commissioners of Johnson County, Kansas and eleven law enforcement officials from the Johnson County Sheriff's Office alleging violations of 42 U.S.C. § 1983 for unlawful search and seizure and excessive force in violation of the Fourth and Fourteenth Amendments. Plaintiffs also asserted a claim for municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658

1

(1978) as well as state law claims of trespass, assault, false arrest, abuse of process, outrageous conduct causing severe emotional distress and false light/invasion of privacy.

In December 2015, this court granted summary judgment in favor of defendants on plaintiffs' 1983 claims on qualified immunity grounds and on the merits of plaintiffs' state law claims. In July 2017, the Tenth Circuit affirmed in part and reversed in part this court's judgment in a fractured decision that resulted in three separate opinions. But in the end, a two-judge majority resolved each of the pertinent issues. Specifically, the Circuit affirmed this court's grant of summary judgment as to plaintiffs' excessive force and *Monell* liability claims and this court's grant of summary judgment to one defendant, Jim Wingo, a sergeant with the Missouri State Highway Patrol. The Circuit reversed this court's grant of summary judgment as to plaintiffs' unlawful search and seizure claims because it held that the defendants were not entitled to qualified immunity. The Circuit also reversed the grant of summary judgment as to the four state law claims pursued by plaintiffs on appeal—trespass, assault, false arrest and outrageous conduct causing severe emotional distress. With respect to plaintiffs' unlawful search and seizure claims, this court subsequently held that the Circuit's decision left only one § 1983 claim for trial—a claim based on the limited theory that defendants Blake, Burns and/or Reddin lied about the results of the field tests conducted in April 2012 such that the warrant was invalid and the resulting search and seizure was therefore unconstitutional.

Plaintiffs' remaining claims were tried to a jury beginning on December 4, 2017. The jury returned its verdict on December 12, 2017 and found in favor of defendants on all issues and claims. Specifically, the jury found that plaintiffs failed to prove by a preponderance of the evidence that any of the defendants who participated in obtaining the warrant (defendants Blake,

Burns and Reddin) lied about the results of any field tests to obtain the warrant. Under the Circuit's decision and the court's instructions to the jury, this finding was fatal to plaintiffs' § 1983 claim. The jury also found that probable cause did not dissipate at any time during the search of plaintiffs' residence. Consistent with Kansas law and the court's instructions to the jury, this finding was fatal to plaintiffs' trespass and false arrest claims and obviated the need for the jury to otherwise resolve plaintiffs' trespass and false arrest claims. Finally, the jury found that plaintiffs failed to prove by a preponderance of the evidence their claims of assault or outrageous conduct causing severe emotional distress against any defendant.

This matter is now before the court on plaintiffs' renewed motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b) (doc. 467) and plaintiffs' motion for a new trial pursuant to Federal Rule of Civil Procedure 59(a) (doc. 470). Plaintiffs' motion for judgment as a matter of law is limited to just two claims asserted by plaintiffs and relates only to one issue in the case—the dissipation of probable cause. Because that motion misconstrues the Circuit's earlier decision in this case and asks the court to weigh the evidence and make credibility determinations, it is denied. Plaintiffs' motion for a new trial is more expansive and asserts errors beginning with the jury selection process and ending with the court's instructions to the jury after the close of the evidence. Discerning no error at any point during the trial of this case, the court denies that motion as well.

**Judgment as a Matter of Law**

Plaintiffs have renewed their motion for judgment as a matter of law on their trespass and false arrest claims. Plaintiffs' argument in support of their motion rests on their contention that

the Tenth Circuit in this case held, as a matter of law, that probable cause dissipated as soon as the deputies learned that plaintiffs had no marijuana grow operation and, more specifically, as soon as the deputies discovered a tomato garden in plaintiffs' basement.  According to plaintiffs, then, they are entitled to judgment as a matter of law because no reasonable jury could have concluded based on the evidence at trial that defendants had probable cause, for the duration of their two-and-a-half hour search, to believe that a marijuana grow operation existed in plaintiffs' home.  As will be explained, the court disagrees.  Contrary to plaintiffs' arguments, the Circuit's statements about dissipation are not legal conclusions that were binding on the jury; a reasonable jury could conclude based on the evidence at trial that probable cause continued for the duration of the search because the deputies had reason to believe for the duration of the search that evidence of a past grow operation existed in plaintiffs' home; and, in any event, plaintiffs would not be entitled to judgment as a matter of law on their trespass and false arrest claims in light of remaining factual disputes that would require resolution by a jury.  The motion is denied.

In resolving plaintiffs' renewed motion for judgment as a matter of law, the court draws all reasonable inferences in favor of defendants, the nonmoving parties.  *See In re Cox Enterprises, Inc.*, 871 F.3d 1093 1096 (10th Cir. 2017).  The court may grant judgment as a matter of law only when "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."  *See id*. (quoting Fed. R. Civ. P. 50(a)(1)).  Stated another way, "judgment as a matter of law is appropriate only if the evidence points but one way and is susceptible to no reasonable inferences which may support the nonmoving party's position."  *Id*. (citations and quotations omitted).

The court begins with plaintiffs' contention that the Circuit held, as a matter of law, that probable cause dissipated as soon as the deputies learned that plaintiffs had no marijuana grow operation and, more specifically, as soon as the deputies discovered a tomato garden in plaintiffs' basement. According to plaintiffs, the Circuit's conclusion as to the specific point at which probable cause dissipated was binding as the "law of the case." The court disagrees. To be sure, Judge Phillips makes numerous statements about the dissipation of probable cause without making reference to the summary judgment standard, but those statements are consistent with the procedural posture of the case on appeal—this court's grant of summary judgment on qualified immunity. While plaintiffs highlight that Judge Phillips' opinion does not contain the "magic" language typically utilized on summary judgment concerning reasonable inferences and the existence of material factual disputes, that fact is not surprising given that such questions arise differently in the qualified immunity context than in other settings. *See Pauly v. White*, 874 F.3d 1197, 1224 (10th Cir. 2017) (the "question of whether a genuine issue of material fact exists is largely irrelevant" in qualified immunity analysis and arises if, and only if, the plaintiff first demonstrates that the defendant's *alleged* conduct violated clearly established law) (Moritz, J., concurring) (emphasis added); *see also Gutteridge v. Oklahoma*, 878 F.3d 1233, 1238 (10th Cir. 2018) (when a defendant asserts qualified immunity at summary judgment, the burden shifts to plaintiff, who "must clear two hurdles" to defeat the motion, including demonstrating that the facts alleged show a constitutional violation). The Circuit, then, was analyzing only whether, if one assumes the validity of plaintiffs' alleged facts, plaintiffs had demonstrated a constitutional violation. *Berglund v. Pottawatomie County Bd. of County Comm'rs*, 350 Fed. Appx. 265, 268 (10th Cir. Oct. 22, 2009); *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009) (in the

qualified immunity context the Circuit generally accepts the facts as the plaintiff alleges them). Because the evidence presented at trial was different from the record reviewed by the Circuit in the context of its qualified immunity analysis,[1] the Circuit's decision concerning the timing of any dissipation of probable cause was not binding on the jury as the law of the case. *See Vaughn v. Ruoff*, 304 F.3d 793, 796 (8th Cir. 2002) (Circuit's earlier opinion on qualified immunity issues in which Circuit described possible procedural due process violation was not binding law of the case); *Oladeinde v. City of Birmingham*, 230 F.3d 1275, 1289-90 (11th Cir. 2000) (Circuit's earlier opinion on qualified immunity issues presented no binding conclusion of law but simply allowed case to proceed to jury, where new and substantially difference evidence was introduced)

In any event, even assuming that probable cause dissipated when the deputies learned that no evidence existed of a marijuana grow operation, a reasonable jury could have found that probable cause did not dissipate at any time during the search of plaintiffs' home. Viewed in the light most favorable to defendants, the evidence at trial was sufficient to demonstrate that the searching deputies, throughout the duration of the search, had a reasonable basis to believe that a marijuana grow operation existed in the home. While the searching deputies realized within twenty or thirty minutes of entering the home that no active grow operation existed in the home,

---

[1] Nothing more clearly demonstrates the difference between the evidence presented at trial and the record reviewed by the Circuit than Trial Exhibit 259.2, an email exchange between Lieutenant Reddin and Lieutenant Pfannenstiel. One of the panel judges relied on this email as evidence that defendant Reddin was "furious" that the "raid" on plaintiffs' home yielded "nothing but tomato plants." In that email, defendant Reddin wrote "SON-OF-A-BITCH!!!" to defendant Pfannenstiel, who replied, "Nothing?????????????????????????" At trial, it was undisputed that this email exchange did not relate to the search at plaintiffs' home, but to another search executed by Sheriff's deputies later that same day.

ample evidence was presented to the jury that the searching deputies had a reasonable basis to believe that evidence of a dismantled grow operation or evidence of recently harvested marijuana existed in the home.

As Judge Phillips noted in his separate opinion in this case, to determine whether and when probable cause dissipated, it is necessary to examine "what the deputies knew and when." Not surprisingly, the evidence about "what the deputies knew and when" was substantially different at trial than it was before the Circuit.  In concluding for purposes of the qualified immunity analysis that probable cause dissipated at some point prior to the end of the search, Judge Phillips appropriately credited plaintiffs' evidence that, prior to the search, the deputies knew only that Mr. Harte had shopped at the Green Circle on one occasion and had received two positive field test results on wet, green vegetative material pulled from plaintiffs' trash.  At trial, however, Deputy Blake testified, based on his experience with narcotics investigations, to his knowledge that the Sheriff's Department—for good or for ill—had engaged in numerous successful narcotics investigations that started with tips from surveillance conducted at the Green Circle on individuals purchasing items for hydroponic grows used to grow marijuana. According to Deputy Blake, then, this knowledge—in addition to his knowledge about the two positive field tests and the Green Circle tip—was in his mind when his search team discovered the hydroponic garden in plaintiffs' basement.

Judge Phillips concluded, again crediting plaintiffs' proffered evidence, that probable cause dissipated based on "what the deputies learned early on in the search."  That evidence included only two empty cups in the hydroponic garden; a finding that Deputy Shoop "helped in the search;" and Deputy Shoop's "admission" that the deputies knew within 15 or 20 minutes

that the deputies "wouldn't have a massive grow operation, as we had speculated." Judge Phillips also emphasized in reaching his conclusion that the deputies "don't explain why they needed so much time" to conclude that there was no active or dismantled grow operation. But at trial, the jury heard that there were 9 empty cups in the garden; that while Deputy Shoop agreed that the deputies knew within 20 minutes that they would not find a "massive" grow operation, he nonetheless believed for at least 90 minutes that they would find evidence of a dismantled grow operation; and that Deputies Blake and Kilbey were searching for evidence of a dismantled grow or harvested marijuana until the conclusion of the search. The jury also heard an explanation from the deputies as to "why they needed so much time" to conduct that search—the size of the house; the fact that the house was messy; and the fact that harvested marijuana could be hidden almost anywhere. The jury, then, clearly had access to much different evidence than what the Circuit had before it and the jury was entitled to weigh that evidence in finding that probable cause did not dissipate during the search.

The jury heard additional testimony about what the searching deputies knew at various points in the search. Deputy Shoop testified that his first impression when he saw the hydroponic garden in the basement was that it was a "non-active" marijuana grow and that plaintiffs were "between a harvest." Deputy Shoop testified that the amount of time, effort and money invested in the garden, coupled with the fact that several empty pots were found in the garden, led him to believe that the searching deputies would find some kind of processed marijuana in the house that had been harvested from the grow operation. Deputy Farkes also testified, based on his experience, that the empty cups from the hydroponic garden indicated to him (coupled with his knowledge that material from the house had tested positive for marijuana)

8

that someone had harvested marijuana from the grow operation in the basement and stored the marijuana somewhere in the house.[2]  Similarly, Deputy Blake testified that, in his mind, the significance of observing the hydroponic garden with at least 9 empty pots indicated to him that someone had harvested marijuana and moved it somewhere else in the home, which caused the deputies to continue searching the home.  According to Deputy Blake, harvested marijuana could be hidden almost anywhere.  Under these facts, coupled with evidence that these deputies knew that vegetative material from the house had tested positive for marijuana, a reasonable jury could conclude that probable cause did not dissipate prior to the end of the search and that the deputies were reasonably still searching for evidence of a past grow operation during that time.

Even plaintiffs concede that defendants' evidence supports the conclusion that 90 minutes into the search, the deputies still had probable cause to believe that evidence of a past grow operation existed in the home.  But they contend that probable cause dissipated at the 90-minute mark and that it was unreasonable for the jury to conclude that probable cause continued after the 90-minute mark.   This argument is based exclusively on the testimony of Deputy Shoop.  Indeed, Deputy Shoop's testimony could be construed as evidence that the deputies, at roughly the 90-minute mark, "switched" from a search for evidence of a past grow operation to a search for evidence of "personal use" marijuana.  But Deputy Shoop was, at most, offering his views based on a limited perspective.  He was the photograph/video officer during the execution of the warrant.  The jury could reasonably have credited the more specific testimony of Deputies

---

[2] Plaintiffs assert that they impeached Deputy Farkes with respect to this testimony.  That, of course, was for the jury to decide.  The court cannot weigh the credibility of a witness on a motion for judgment as a matter of law.  *See Elm Ridge Exploration Co. v. Engle*, 721 F.3d 1199, 1216 (10th Cir. 2013).

Blake and Kilbey on this point. Both of these defendants personally searched the home and both testified that, for the duration of the search, they were searching for marijuana in "all forms," including but certainly not limited to personal use marijuana. On this motion, the court may not credit the testimony of Deputy Shoop over the testimony of other witnesses.

Finally, plaintiffs have not demonstrated that they are entitled to the relief they seek—judgment as a matter of law—even if the court accepted their argument that no reasonable jury could have concluded that probable cause did not dissipate during the search of plaintiffs' home. Based on the format of the verdict form, the jury's threshold finding that no dissipation occurred obviated the need for the jury to address plaintiffs' trespass and false arrest claims. Consistent with the court's directions on the verdict form, the jury "skipped" over the trespass and false arrest questions based on their finding that no dissipation occurred. Plaintiffs did not object to the approach utilized by the court in drafting the verdict form. Had the jury found dissipation, then the jury would have continued to resolve the trespass and false arrest claims as to each plaintiff and each defendant. Plaintiffs do not suggest that no factual disputes existed as to these claims and, in fact, the record at trial clearly reflects such disputes.

With respect to plaintiffs' trespass claims, defendants' evidence was sufficient to support a reasonable inference that the continued presence of the deputies in plaintiffs' home after the 90-minute mark was justified (or even, in the absence of evidence that plaintiffs asked the deputies to leave, that plaintiffs consented to it) for the reasonable amount of time that it took for deputies to complete specific tasks necessarily associated with executing the valid warrant, such as taking a "post search" video of the house (to establish that deputies were leaving the home in

the same condition in which it was found) and completing paperwork.[3]  With respect to plaintiffs' false arrest claims, defendants' evidence demonstrated that plaintiffs were free to leave the home, a finding that would have been fatal to plaintiffs' false arrest claims had the jury made it.  These disputes, then, would have to be resolved by a jury.  Judgment as a matter of law is not appropriate.

**Motion for New Trial**

Rule 59(a) authorizes a court to grant a new trial on all or some of the issues for "any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a).  Plaintiffs' motion for a new trial is based on several asserted errors, including the court's denial of four for-cause challenges during jury selection; the court's failure to instruct the jury that probable cause dissipated when the defendants learned that plaintiffs had no marijuana grow operation in their home; the court's refusal to admit into evidence communications between defendants and their counsel after the attorney-client privilege was waived; the court's refusal to permit plaintiffs to present evidence of their "general warrant" theory to the jury; and improper comments allegedly made by defense counsel to the jury concerning plaintiff's expert witness.  Discerning no error relating to any of these issues, the court denies the motion in its entirety.

---

[3] Interestingly, Judge Phillips, despite his conclusion for purposes of qualified immunity that probable cause dissipated such that the continued search became unreasonable, found that summary judgment in favor of defendants was appropriate on plaintiffs' trespass claim. According to Judge Phillips, the valid warrant permitted the deputies to enter plaintiffs' home such that no trespass occurred.

*A.    Jury Selection*

Plaintiffs first assert that three prospective jurors and one seated juror should have been deemed actually and/or impliedly biased and struck for cause.  The court denied plaintiffs' for-cause challenge as to each of these jurors and plaintiffs utilized their peremptory challenges to strike three of them.[4]  The evaluation of a juror's actual bias is based upon "determinations of demeanor and credibility that are peculiarly within a trial judge's province."  *Zia Shadows, LLC v. City of Las Cruces*, 829 F.3d 1232, 1243 (10th Cir. 2016).  Actual bias is a question of fact reviewed only for clear error, *United States v. Powell*, 226 F.3d 1181, 1188 (10th Cir. 2000), and is shown by the "express admission of the juror of a state of mind prejudicial to a party's interest."  *United States v. Brooks*, 569 F.3d 1284, 1289 (10th Cir. 2009).  The trial court's function in assessing actual bias is to rely on its own evaluation of "demeanor evidence and of responses to questions" to reach a conclusion as to impartiality and credibility.  *Powell*, 226 F.3d at 1188.

Implied or presumed bias is a legal determination dependent "on an objective evaluation of the challenged juror's experiences and their relation to the case being tried."  *Zia Shadows*, 829 F.3d at 1243 (quotations and citations omitted).  A "finding of implied bias is appropriate where the juror, although she believes that she can be impartial, is so closely connected to the circumstances at issue in the trial that bias is presumed."  *Id* at 1244.  The Tenth Circuit has held

---

[4] Because plaintiffs utilized their peremptory challenges to remove prospective Jurors 01-0072; 01-0014; and 01-0026, any error stemming from the court's refusal to strike these jurors for cause would be harmless in any event.  *See Getter v. Wal-Mart Stores, Inc*., 66 F.3d 1119, 1122-23 (10th Cir. 1995) (erroneous denial of for-cause challenge was harmless where party removed juror with peremptory challenge; rejecting argument that loss of peremptory challenges violates Fifth or Seventh Amendment rights).

that the implied-bias doctrine "is not to be lightly invoked, but must be reserved for those extreme and exceptional circumstances that leave serious question whether the trial court subjected [a party] to manifestly unjust procedures resulting in a miscarriage of justice." *Id.* (quoting *Powell*, 226 F.3d at 1188). Accordingly, the Circuit requires claims of implied bias to meet a "high threshold." *Id.* (quoting *Powell*, 226 F.3d at 1188).

1.  Actual Bias

Plaintiffs assert that prospective Juror 01-0026, who was struck by plaintiffs on a peremptory challenge, was actually biased against them. During voir dire, Juror 01-0026 related what could be construed as a negative experience that she had with law enforcement nearly 20 years ago. When the court asked Juror 01-0026 whether that experience would affect her ability to be fair and impartial, Juror 01-0026 responded "I would hope not." When pressed by the court about her ability to be fair and impartial, Juror 01-0026 further responded "As a matter of fact, I actually am in more support of the police than not." Based on this statement, and certain additional remarks made by Juror 01-0026 during plaintiffs' counsel's voir dire, plaintiffs maintain that Juror 01-0026 maintained an actual bias and should have been struck for cause.

During his portion of the voir dire questioning, plaintiffs' counsel asked Juror 01-0026 why she felt "more in support of the police than not." Juror 01-0026 responded as follows:

> Quite honestly, I believe that the police have a very unenviable position now. They are the people we go to when we have problems. They're the people that step in whenever there's any issue at all that we can't take care of and yet they are the first to be accused of all kinds of problems, issues, as evidenced in every— almost every city across the country. So, I feel—I believe that we are—that they get a bum rap for a job that is extremely difficult.

Shortly thereafter, in response to plaintiffs' counsel's question as to whether his clients would "start out a little behind the police simply because they're accusing the police of doing something wrong," Juror 01-0026 stated:

> I would hate to be in their spot and listen to someone say this, but—but if I'm going to be honest, I believe that actually is probably true. But, again, I don't think that I would—I would—I would like to believe that I would be able to listen to what is being evidenced and make a decision based on that.

At that juncture, the court explained to Juror 01-0026 and the rest of the panel that the key issue for purposes of jury selection was whether each prospective juror, including Juror 01-0026, would be able to put aside any positive feelings about law enforcement and listen to the evidence in the case and decide the case "solely on the evidence and the law." In response to that question, Juror 01-0026 responded: "I believe I could—being truthful about how I feel, I still believe that I would be able to render a decision based on facts."

Despite Juror 01-0026's expression of positive views about law enforcement, the court is persuaded—as it was at trial—that Juror 01-0026 was not prejudiced against plaintiffs or biased in favor of defendants. Significantly, Juror 01-0026 also expressed that she supported the individual rights of citizens under the Constitution and she affirmed to the court that she would be able to decide the case based on the evidence presented in the court room rather than on her general views about law enforcement or the constitutional rights of citizens. Juror 01-0026 unequivocally testified to her belief that she could be an impartial juror and the court found as a matter of fact that Juror 01-0026, if selected, would render an impartial verdict on the evidence.

14

Nothing in plaintiffs' submissions suggests to the court that it should not have accepted Juror 01-0026's clear statements of impartiality.[5]

Plaintiffs also contend that potential Juror 01-0072, whom plaintiffs also struck, harbored an actual bias against plaintiffs and in favor of defendants. They assert four separate bases for this argument, three of which completely lack merit and will be addressed in short order. Plaintiffs assert that Juror 01-0072 was somehow biased because he was a reserve police officer years ago in Ottawa, Kansas; he was experiencing problems in a personal relationship that caused him to doubt his ability to focus; and he expressed a belief that marijuana was "not a good thing." Plaintiffs' counsel did not follow up with Juror 01-0072 on any of these topics. Thus, there is nothing in the record about whether Juror 01-0072's experience as a reserve police officer was positive or negative that might indicate a bias one way or the other. The court confirmed with that juror, however, that his experience would not impair his ability to decide the case based upon the evidence and the law. The court also confirmed with Juror 01-0072 that his relationship problems (which, of course, do not reflect a bias of any kind) had not impaired his ability to participate in the voir dire process and would not interfere with his ability to serve on the jury if selected. Finally, with respect to the statement about marijuana, the court explained to Juror 01-0072 that the case was "not about whether marijuana is good or bad" and asked Juror 01-0072 whether he could "decide this on the evidence and the law despite the fact that you

---

[5] To the extent Juror 01-0026 made equivocal remarks about her impartiality prior to the court's explanation, the court believes that those remarks stemmed from an unfamiliarity with the nature of the voir dire process, when "potential jurors often make ambiguous and inconsistent statements regarding partiality" on issues that are presented only in the abstract. *See Goss v. Nelson*, 439 F.3d 621, 633 (10th Cir. 2006). When the core question was presented to Juror 01-0026, the court believes her response unequivocally demonstrated her impartiality.

don't like marijuana?" Juror 01-0072 responded that he could do so. Having had the opportunity to view the demeanor of Juror 01-0072 and to listen to his responses on these issues, the court has no doubts about Juror 01-0072's ability to render an impartial verdict if he had been selected to serve.

Plaintiffs' primary concern with Juror 01-0072 is that he managed an appliance and electronics company that supplies various products to offices in Johnson County, including the Sheriff's Department. The court asked the juror whether "anything about that . . . would get in the way of your deciding this case just on the evidence and the law?" Juror 01-0072 responded, "I guess in total honesty, it would be iffy. I guess maybe the only way I could put it is business is business and stuff. So it could be difficult, yes." The court then asked the juror whether that business relationship would affect his deliberations and whether he would be "sitting there thinking I could get in trouble with my business." To that question, Juror 01-0072 responded, "Maybe, not necessarily, no." The court then asked three separate follow-up questions which confirmed Juror 01-0072's impartiality:

> Q: Is it something that if the evidence in this case persuaded you that the Hartes had met their burden of proof, as I'll describe that to you, to prove what I will explain to you the law would require for them to obtain a verdict, would you be able to render a verdict in favor of the Hartes irrespective of that business relationship that you've just described?
>
> A: I believe I could, yes.
>
> Q: And would you be able to listen to the testimony from the people that are brought forth by the Hartes as well as the people brought forth by the defendants and give them equal credit and attention, depending upon what you make of what they say from the witness stand and not from some other reason?
>
> A: I believe so, yes.

Q: Okay. All right. Conversely, if the evidence demonstrated that the Hartes had not met their burden of proof, would you be able to render a verdict in favor of defendants?

A: Yes.

Contrary to plaintiffs' assertion, then, Juror 01-0072 never "admitted to actual bias" and, at most, expressed uncertainty about what affect the relationship between his employer and Johnson County might have on his impartiality until the court focused the juror on the pertinent issue—whether the juror would be able to decide the case based solely on the evidence and the law. After evaluating the juror's credibility and demeanor, the court was satisfied—and remains satisfied—that the prospective juror would have been impartial and harbored no actual bias.

Juror 01-0017 is the only seated juror challenged by plaintiffs.[6] Plaintiffs contend that Juror 01-0017 expressly admitted actual bias that rendered her unable to decide the case fairly. Juror 01-0017 never admitted actual bias. As an initial matter, Juror 01-0017 did not raise her hand when the court asked the panel if anyone "would simply have a problem finding that the Hartes met their burden of proof just because of your feelings about law enforcement, your positive relationships with law enforcement that you may have had?" This, of course, is a clear indication that Juror 01-0017 harbored no actual bias in favor of law enforcement.[7] Later, Juror

_____

[6] Even assuming that Juror 01-0017 was biased, plaintiffs have not shown that the presence of this juror on the panel had a "substantial influence" on the outcome of the trial and did not object to the composition of the jury as seated. Any error, then, would be harmless. *See Hatfield v. Wal-Mart Stores, Inc*., 335 Fed. Appx. 796, 802 (10th Cir. July 2, 2009).

[7] To assist the jurors in understanding the specific question posed to them by the court, the court explained the impartiality issue by using the example of a person who supports a local sports team. As explained by the court, the key question was whether that sports fan, who might tend to think that his or her team can "do no wrong," could nonetheless put aside the fact that he or she supports that team and decide the issues based on the evidence rather than based on generalized "feelings" that he or she maintained about the team.

01-0017, in response to the court's question to the panel as to whether anyone had been the subject of a law enforcement investigation, stated that she had pled guilty to the crime of misdemeanor burglary roughly 10 years earlier and "paid the price" by serving a term of probation. Juror 01-0017 confirmed that her experience would not affect her ability to serve as a fair and impartial juror. While Juror 01-0017 did not provide any positive or negative assessment about her experience, it is not the type of experience that would suggest a bias in favor of law enforcement.

The specific comments made by Juror 01-0017 that plaintiffs contend show bias came later in the voir dire process after plaintiffs' counsel's questioning of prospective Juror 01-0026 and, more specifically, this court's discussion with Juror 01-0026 about whether she could set aside her positive feelings about law enforcement and decide the case based solely on the evidence and the law. Plaintiffs' counsel then asked the panel whether anyone felt similarly to Juror 01-0026 that plaintiffs "will start a step or two behind because they're suing the police." Juror 01-0017 responded, "To be honest with you, yes." When asked to explain, she responded, "That's the way I was raised. There's right and wrong, and you always call the police. I mean, they're the keepers—they're the—and I can't help—I'm being honest." At that point, the court had the following exchange with Juror 01-0017:

> Court:  Now, we all have—we all come to this with—with preconceived feelings and beliefs and life experience and—and it is totally impossible to just walk in the door of a courtroom and flush out all those ideas. But to be able to sit as a juror on the case, you must be able to say those are my ideas, those are my beliefs. I think something is good or I think something should happen in general, that's just how I feel about things. But I'm going to take a look at the evidence here, decide what I think really happened, and then look at the rules that the Court tells me applies, and then I'm going to decide whether this is a case that should come out one way or the other. This case is not about whether marijuana is good, whether law

enforcement is good, whether the Constitution is good.  None of this is about that.
This is about what happened or didn't happen and what the rules are that would
then bring about a result from what happened or didn't happen.  Now, do you
believe that you could set aside your personal views and decide this case just on
the law as it is?  If you don't think you could do that, I'll excuse you—

A:  No, that's—

Court:  --and nobody is going to be mad at you.

A:  If you define it, then yes.

Court:  I'll define the rules.  You just have to decide what happened and apply it.

A:  Okay.  Yes, I think I could.

Court:  Do you think you could do that?  Okay.

Plaintiffs' counsel asked nothing further of Juror 01-0017 nor objected to the form of the court's

explanation.  Thus, when asked a direct question by the court about her ability to set aside her

personal beliefs and to decide the case based on the evidence and the law as provided by the

court, Juror 01-0017 gave an answer which assured the court that she could do that so long as

the court explained the law to the jury.  The court had the opportunity to evaluate Juror 01-

0017's responses and demeanor and was convinced that she was not biased against plaintiffs or

in favor of defendants.

## 2.  Implied Bias

Plaintiffs assert that prospective Jurors 01-0072 and 01-0014, both of whom were struck

by plaintiffs, were impliedly biased in favor of the defendants.  The implied-bias doctrine "asks

whether an average person in the juror's position would be partial, not whether the juror was, in

fact, partial to one side." *Zia Shadows*, 829 F.3d at 12146 n.9. Thus, when examining the issue

of implied bias, the juror's "voir dire statements do not meaningfully illuminate" the issue. *Id.*

According to plaintiffs, prospective Juror 01-0072 should have been deemed impliedly

biased and struck for cause based on his "business relationship with defendants." As noted

earlier, that juror managed an appliance and electronics company that supplies various products

to offices in Johnson County, including the Sheriff's Department. Clearly, then, Juror 01-0072

did not maintain any business relationship of any kind with any of the individual defendants. To

the extent he maintained some form of business relationship with the Board of County

Commissioners, there is no indication that Juror 01-0072 had a direct financial interest in the

trial's outcome as contemplated by Tenth Circuit law. *Compare Getter v. Wal-Mart Stores, Inc.*,

66 F.3d 1119 (10th Cir. 1995) (district court erred by refusing to excuse juror who held stock in

the defendant corporation and whose wife worked for the defendant) *with Vasey v. Martin*

*Marietta Corp.*, 29 F.3d 1460 (10th Cir. 1994) (district court did not abuse its discretion in

declining to excuse for cause a juror who was employed by a company that had a consulting

contract with the defendant; the juror's status as an employee of a company that performed work

for the defendant was too "remote" to constitute an exceptional circumstance warranting a

presumption of bias). In short, the record fails to demonstrate that Juror 01-0072 was impliedly

biased.[8]

---

[8] In their reply, plaintiffs assert that Juror 01-0072 was "not merely an *employee* of a company whose business might be impacted by the verdict." This assertion is curious, as Juror 01-0072 first testified that he "worked for" an appliance and electronics company and later testified that he "managed" that company. Both responses indicate an employee relationship with the business. There was no indication that the prospective juror had an ownership interest in the

Plaintiffs contend that prospective Juror 01-0014 should have been struck for cause based on his personal friendship with one member of the Board of County Commissioners. The record is devoid of any information concerning the length and depth of that friendship, as plaintiffs' counsel declined to explore that issue further in voir dire. Nonetheless, plaintiffs direct the court to no case law indicating that a juror's personal friendship with one member of a governing board who is named as a defendant constitutes an exceptional circumstance warranting a presumption of bias. The court has uncovered no case supporting plaintiffs' argument. And in light of the relationship identified here—where the juror's friendship was not with an individual defendant or witness in the case—the Tenth Circuit's cases relating to implied bias of jurors are not helpful to plaintiffs. *See Skaggs v. Otis Elevator Co*., 164 F.3d 511, 517 (10th Cir. 1998) (bias may be found where the juror is a "close relative" of one of the participants); *United States v. Bradshaw*, 787 F.2d 1385, 1390 (10th Cir. 1986) (declining to presume bias when jurors were personally acquainted with government witnesses); *see also Sedillo v. Hatch*, 445 Fed, Appx. 95, 104-05 (10th Cir. Oct. 24, 2011), *citing with approval Ray v. Johnson,* 1999 WL 800173, at *1 (5th Cir. Sept. 20, 1999) (a "friendship with the victim, even a close friendship, is not sufficient to imply bias to a juror"). Cases from other Circuit Courts of Appeal are similarly unhelpful. *See United States v. Ervin*, 517 Fed. Appx. 734, 743 (11th Cir. 2013) (juror's bias may be implied if the juror has a "special relationship" with a party, such as a familial or master-servant relationship); *United States v. Calabrese*, 942 F.2d 218, 224-25 (3d Cir. 1991) ("A juror who merely had a passing acquaintance with one of the defendants would not, on the basis of

---

company or that his compensation would in any way be affected by a judgment against defendants. Thus, there was no showing of a direct financial interest in the outcome of the case.

acquaintance alone, be rendered incompetent to serve in this case." (listing cases of non-bias based on juror relationships with the defendant's family, the defendant, the victim, or other participants in the proceedings, such as a prosecutor, investigator, or social worker)). Plaintiffs have not demonstrated that prospective Juror 01-0014 was so "closely connected" to this case by virtue of his friendship with a Board member that he was biased as a matter of law.

For the foregoing reasons, the court discerns no error during the jury selection process that rendered the trial unfair in any respect. This aspect of plaintiffs' motion is denied.[9]

B.    *Dissipation Instruction*

According to plaintiffs, the court erred in failing to instruct the jury for purposes of plaintiffs' trespass and false arrest claims that, as a matter of law, probable cause dissipated when defendants learned that plaintiffs had no marijuana grow operation in their home. Plaintiffs' argument is based on the Tenth Circuit's decision in this case, *Harte v. Board of Comm'rs*, 864 F.3d 1154, 1182 (10th Cir. 2017) and is presented as an alternative to their motion for judgment as a matter of law. Essentially, plaintiffs contend that even if the court

---

[9] Plaintiffs also seem to challenge, on the grounds that defendants were "saved" from using a peremptory strike, the court's decision to excuse a juror who expressed a bias against defendants. Unlike any of the jurors that plaintiffs sought to remove for cause, Juror 01-0042 stood up in the middle of the proceedings, unprompted, and expressly announced that he had "a personal bias against Johnson County" and his belief that he would not be "unbiased" in the case. Plaintiffs assert that the court erred by not asking that juror the "do or die" question on impartiality. After observing this juror's demeanor and hearing the juror's clear and emphatic expression of bias, the court concluded that any effort at rehabilitation or explanation was both futile and an inefficient use of the court's time and the jury's time. No error occurred when the court excused this juror without further questioning.

denies their motion for judgment as a matter of law, it should nonetheless grant a new trial on trespass and false arrest with the following instruction to the jury:

> Probable cause dissipated when Defendants learned that Plaintiffs had no marijuana-grow operation. Accordingly, if you find that Defendants continued to search Plaintiffs' residence after dissipation of probable cause, they lacked a legal privilege to remain in the residence.

This argument is rejected. As fully explained above in connection with plaintiffs' motion for judgment as a matter of law, the court does not believe that the Circuit's statements about the dissipation of probable cause were legal conclusions that were binding on the jury. Rather, the jury was appropriately permitted to decide, based on the evidence presented at trial concerning what the deputies knew and when they knew it, whether probable cause dissipated at any time during the search. Toward that end, the court instructed the jury on probable cause and dissipation in accordance with the applicable law. Plaintiffs' proposed instruction, then, simply sets forth plaintiffs' theory on whether and when dissipation occurred—a theory that plaintiffs' advanced during the trial and argued at the conclusion of the evidence. Because the jury was permitted but not obliged to find that dissipation occurred "when Defendants learned that Plaintiffs had no marijuana-grow operation," that issue was appropriately left to the argument of counsel.

Had the court been inclined to include a dissipation instruction that mirrored the language of the Circuit, it would not have utilized plaintiffs' proposed instruction because it is vague and unhelpful. The phrase "when Defendants learned that Plaintiffs had no marijuana-grow operation" is ambiguous and undoubtedly would have raised more questions than it answered. Does it mean when defendants realized that no active grow existed? When defendants realized

that no evidence of a dismantled grow operation existed?  Or when defendants realized that no evidence of harvested marijuana from a past grow operation existed?  Thus, plaintiffs have not shown any prejudice by the court's failure to give the instruction, particularly in light of the ambiguous nature of the phrase "no marijuana-grow operation."  *See McInnis v. Fairfield Communities, Inc*., 458 F.3d 1129, 1140 (10th Cir. 2006) (explaining that failure to give jury instruction is reversible only if prejudicial).    Moreover, the jury could have found dissipation under the instruction the court gave.  As noted earlier, however, there was ample evidence from which the jury could have concluded that probable cause did not dissipate at any time during the search even under plaintiffs' theory.  Finally, the proposed instruction does not speak to the false arrest claim in any respect and, thus, plaintiffs have not demonstrated that the result on that claim would be different if the proposed instruction had been given.

C.    *Exclusion of Evidence*

Plaintiffs contend that the court erred in excluding two categories of evidence at trial. First, the court refused to admit into evidence communications between Sheriff Denning (and his office) and defense counsel after Sheriff Denning testified that he relied on the advice of counsel in rejecting plaintiffs' request for records under the Kansas Open Records Act (KKORA).  Second, the court refused to permit plaintiffs to present to the jury evidence of a "general warrant" theory of liability under § 1983.

1.  Communications Regarding Advice of Counsel

24

Part of plaintiffs' claim in this case is that the conduct of Sheriff Denning and other defendants after the raid was outrageous because the defendants did not disclose to plaintiffs the facts and circumstances which led to the raid. During his direct examination, Sheriff Denning was asked by plaintiffs' counsel about the basis for his decision, in August 2012, not to provide plaintiffs with a copy of the search warrant affidavit in response to plaintiffs' request pursuant to the Kansas Open Records Act. Upon further questioning, Sheriff Denning testified that his decision not to provide any records to plaintiffs was based on the "advice of counsel." When plaintiffs' counsel asked a follow up question as to whether defense counsel had advised Sheriff Denning not to provide any records to plaintiffs, defense counsel objected to the question based on the attorney-client privilege. The court overruled the objection, stating that "To the extent Sheriff Denning is relying on advice of counsel, that waives the privilege to that particular reliance." Ultimately, Sheriff Denning testified that he refused to provide a copy of the warrant after discussions with defense counsel and the Johnson County District Attorney because the release of the warrant would disclose the name of an undercover narcotics officer (defendant Jim Wingo, a sergeant with the Missouri State Highway Patrol); would disclose that officer's investigative techniques pertinent to Operation Constant Gardener (surveilling hydroponic stores and conducting trash pulls); and would disclose the fact that Johnson County was obtaining information about potential suspects from Sergeant Wingo. At the end of that trial day, outside the presence of the jury, plaintiffs' counsel asked for the production of documents related to Sheriff Denning's testimony that he relied on the advice of counsel when he refused to provide the search warrant to plaintiffs in response to their Open Records request. Because the court believed that it would be relevant for plaintiff to attack Sheriff Denning's credibility by

showing that he had not received such advice, at least in writing, the court directed defense counsel to verify whether any written communications existed concerning advice to Sheriff Denning or Lieutenant Pfannenstiel about not disclosing the warrant in response to plaintiffs' request and, if so, to provide a copy of those communications to the court the following morning for in-camera review.

After reviewing the communications received in camera from defense counsel, the court ordered that the communications be produced to plaintiffs' counsel.  While the court found "nothing particularly remarkable" in those communications, the court did indicate that the communications did not specifically mention the idea of protecting a confidential source or investigative techniques such that the issue was "fair game for cross examination."  The court cautioned, however, that it questioned whether it would permit the admission of those communications into evidence because the communications did not add anything to that one salient point—the lack of a specific reference to protecting a source or technique.  Shortly thereafter, plaintiffs' counsel continued his direct examination of Sheriff Denning during which the court admitted Exhibit 1200 (an August 15, 2012 email from defense counsel to Sheriff Denning's records custodian) for the purpose of exploring the notion that Sheriff Denning had relied on the advice of counsel in refusing plaintiffs' Open Records request.  Plaintiffs' counsel then displayed that email to the jury and asked Sheriff Denning:  "And Mr. Ridgeway told Miss Whacker with respect to the Hartes' August 10th, 2012 KORA request, 'seeing as this is from [plaintiffs' counsel], we'll need to nip this in the bud, ASAP;" correct?"  Before Sheriff Denning could respond, the court interjected as follows:

26

> That is not probative on the issue of whether or not Mr. Denning was told specific reasons why he should not turn things over. That particular reference, whether or not somebody said "nip it in the bud," I'm going to—I'm going to strike that. I'm going to strike that exhibit if that's all you're trying to put in here.
>
> The issue is did Mr. Denning receive a written correspondence from the Ferree law firm that told him that he should reject the KORA request because of disclosing a confidential source or the means of the investigation.
>
> The fact is if there's nothing in those e-mails that supports that, that's fine. But going into what language the lawyers used to discuss the handling of it is not relevant for the purpose for which you asked to have those e-mails made available. So as it stands right now, take that—take that email down.

The court then struck the exhibit from the record and instructed the jury to disregard it.

Plaintiffs' counsel then requested a side-bar with the court during which the court further explained that it ordered the documents be produced for only one reason and that they were otherwise protected:

> I'm not going to let them be used for any purpose other than to refute [Sheriff Denning's] particular claim. That's a narrow reading of waiver, I appreciate that, but I think that's an appropriate reading here. Under Rule 403 I would not permit any additional inquiry into those e-mails about the "need to nip this in the bud." Who knows what that means. That means Mr. Ridgeway would need to come testify. What it means is we need to resolve this with a nice apology tomorrow or whatever, or we need to go litigate this to the walls. But that absolutely, under 403, asserts a bunch of stuff that takes us on a course that's not appropriate.

The court also rejected plaintiffs' counsel suggestion that they be permitted to ask questions about documents in which defense counsel advised Sheriff Denning to apologize to plaintiffs. As noted by the court, that issue was a "collateral matter" concerning "public relations" advice wholly distinct from the issue of legal advice on the KORA request and, accordingly, those documents were irrelevant.

After Sheriff Denning was excused and outside the presence of the jury, plaintiffs' counsel asserted their belief that the emails and communications produced by defendants contradicted Sheriff Denning's testimony regarding the reasons the KORA request was denied and that those communications "go to Denning's motive, bias, credibility" and made an offer of proof regarding Exhibit 1300, which consisted of the documents that had been produced by defendants in response to the court's order on the privilege issue.

In their motion for new trial, plaintiffs assert that the court erred in refusing to admit the communications produced by defendants (collectively Exhibit 1300) because those communications were relevant not only for impeachment purposes but also "to the outrageousness of defendants' conduct." In their motion, plaintiffs' highlight only two specific emails—the "nip it in the bud" email from defense counsel and one in which defense counsel suggests to Lieutenant Pfannenstiel that, if the field tests are deemed faulty, "we may want to do damage control and advise the Hartes of the wherefores and whys; and if they feel necessary, explain to neighbors what caused the situation, etc." Presumably, plaintiffs have highlighted these two emails because plaintiffs have deemed these emails the most helpful to their theory of the case.

While the "nip it in the bud" email was within the scope of Sheriff Denning's waiver as it related to defense counsel's advice regarding the KORA request, the "damage control" email from defense counsel cannot reasonably be said to fall within the scope of Sheriff Denning's waiver. *See Sprint Communications Co. v. Comcast Cable Communications LLC*, 2014 WL 3611665, at *3-4 (D. Kan. July 22, 2014) (subject matter waiver is reserved for those "unusual" situations in which fairness requires a further disclosure of related, protected information to

prevent a selective, misleading presentation of evidence). Plaintiffs have demonstrated no relationship between this email and Sheriff Denning's decision to reject plaintiffs' KORA request. Sheriff Denning testified that he refused the KORA request based on the advice of counsel. The "damage control" email has no demonstrable relationship to the KORA request and the only advice therein is, as noted by the court at trial, "public relations" advice (rejected by Sheriff Denning rather than relied upon by him) suggesting that the Sheriff's Department should consider an apology to plaintiffs and an explanation that the field tests were faulty. In fact, if the court had had more time to review in camera the submissions by defense counsel, it would have concluded that this email did not fall within the scope of the waiver and need not be produced to plaintiffs.

Plaintiffs are correct that the "nip it in the bud" email was relevant to the impeachment of Sheriff Denning's testimony regarding his reason for rejecting plaintiffs' KORA request. That, of course, is why the court initially admitted the email into evidence, because it lent no support to Sheriff Denning's claim of advice of counsel. But plaintiffs' counsel declined to utilize the email for impeachment purposes, instead choosing to focus the jury's attention on the specific language used by the lawyer in discussing the issue with Sheriff Denning's office. Plaintiffs, then, had the opportunity to impeach Sheriff Denning with the email (by noting that the email, contrary to Sheriff Denning's testimony, did not include any specific advice about refusing the KORA request) but declined to do so. The "damage control" email, in contrast, was not relevant to the impeachment of Sheriff Denning's testimony. Nothing in that email contradicts Sheriff Denning's testimony about his decision to reject the KORA request and, thus, the email could

29

not be singled out for impeachment purposes.  Plaintiffs, then, have identified no error in connection with their ability to impeach Sheriff Denning's testimony on this issue.[10]

Plaintiffs further suggest that the emails, regardless of impeachment purposes, were relevant to plaintiffs' *Franks* claim and outrageous conduct claims.  The record establishes otherwise.  According to plaintiffs, the emails suggest that defendants "engaged in a cover up" after the search of plaintiffs' home to "hide" underlying misconduct such as a deliberate falsehood used to obtain the warrant.  While plaintiffs freely explored and advanced this "cover up" theory at trial, nothing in the emails produced by defendant in response to the waiver issue remotely supports that theory.  Plaintiffs' *Franks* claim was strictly limited to whether defendants Burns, Blake and/or Reddin lied about the results they obtained on field tests they conducted.  Sheriff Denning's denial of the KORA request (or, more specifically, whether he relied on counsel in making that decision or whether counsel suggested more transparent public relations efforts) does not suggest that one of those individual defendants might have lied to obtain the warrant.  It defies logic to believe that Sheriff Denning refused the KORA request to "hide" department misconduct when the warrant and the information underlying the warrant would undoubtedly be produced in litigation at some point.  Moreover, regardless of the emails, plaintiffs presented their "cover up" theory to the jury in connection with the *Franks* claim and the jury clearly rejected that theory.  Plaintiffs have not demonstrated (or even argued) that the

---

[10] Plaintiffs' counsel did utilize the entirety of the documents proffered as Exhibit 1300 to ask Sheriff Denning whether anything in that stack of documents contained specific advice from counsel to refuse the KORA request based on the need to protect Sergeant Wingo's identity or investigative techniques.  Sheriff Denning testified that the documents contained no such advice.  Therefore, admission of the exhibit itself would merely have been cumulative for its proper purpose.

admission of any specific email would have tipped the scales on that claim. At most, the emails would have been cumulative and at worst, because the "damage control" email involves an acknowledgment by the manufacturer of the field tests utilized by the deputies that the tests react positively when mixed with caffeine, would have actually buttressed the credibility of the deputies who conducted the tests. *See* Exhibit 1300 at 1300.32, 1300.34, 1300.36, 1300.38-.39, 1300.40 & 1300.42-43.

The court also rejects plaintiffs' argument that the "damage control" email is probative of their outrageous conduct claim. According to plaintiffs, Sheriff Denning's refusal to apologize to plaintiffs—despite counsel's advice that he consider issuing an apology—somehow demonstrates outrageous conduct on the part of Sheriff Denning. But plaintiffs introduced ample evidence in support of their outrageous conduct claim that Sheriff Denning steadfastly refused to apologize to plaintiffs. The jury concluded that Sheriff Denning's refusal to apologize did not constitute outrageous conduct. There is simply no basis to conclude that the jury would have concluded otherwise had they known that defense counsel, at one time, had suggested that Sheriff Denning consider an apology. The probative value, then, of the "damage control" email is low.

Finally, any marginal relevance of the emails was substantially outweighed by Rule 403 considerations, including wasting the jury's time on collateral issues (such as exploring the meaning of various phrases utilized by counsel in the emails) and potentially confusing the jury on the significance of Sheriff Denning's rejection of the KORA request.

For the foregoing reasons, plaintiffs have not shown any error in the court's refusal to admit the communications produced by defendants relating to Sheriff Denning's reliance on the advice of counsel in rejecting plaintiffs' KORA request.

2.  General Warrant Theory

Plaintiffs contend that the court erred when it refused to permit plaintiffs to present evidence at trial supporting a "general warrant" theory of liability under § 1983.  This is an issue that the parties fully briefed and the court resolved in writing after the Tenth Circuit's mandate issued and prior to the start of trial.  In short, this court granted summary judgment on plaintiffs' general warrant theory in December 2015 because the record contained no evidence that any deputy conducted a general exploratory search of the residence or searched for criminal conduct unrelated to marijuana.  Despite plaintiffs' insistence that the Circuit's decision reversed that ruling such that their general warrant theory survived for trial, no judge on the panel reversed summary judgment on the general warrant theory.  This court, then, held that plaintiffs were not entitled to proceed to trial on that theory because this court's summary judgment ruling remained undisturbed.

In their motion for new trial, plaintiffs contend that the court's failure to permit them to proceed to trial on their general warrant theory is grounds for a new trial.  Plaintiffs incorporate by reference their prior submissions on this issue and defendants have done the same.  Because none of the parties have offered any new arguments or authorities pertinent to this issue but simply reference their prior submissions, the court follows suit and denies plaintiffs' motion for the reasons set forth in its November 3, 2017 memorandum and order (doc. 385).

32

D.    *Improper Comment by Defense Counsel*

At trial, plaintiffs called their sole expert witness, Michael Bussell, to testify that the KN reagent utilized by the deputies in field-testing the material found in plaintiffs' trash in fact yields negative test results when performed on the type of tea brewed by Ms. Harte.  According to plaintiffs, this testimony was essential to plaintiffs' theory that defendants Burns, Blake and/or Reddin lied about obtaining a positive test result in April 2012.  In their motion for new trial, plaintiffs assert that defense counsel improperly suggested to the jury that Mr. Bussell's police career ended because of misconduct.  Plaintiffs contend that defense counsel's improper comment eroded Mr. Bussell's qualification as an expert and cast doubt on Mr. Bussell's credibility.

By way of background, defense counsel notified the court during a sidebar that he intended to ask Mr. Bussell about his reasons for leaving the Lenexa Police Department, arguing that he had reason to believe that Mr. Bussell, contrary to a statement made in his resume indicating that retired because of an injury, resigned because he knew that termination for misconduct was imminent.  Plaintiffs' counsel represented to the court that the official records of the police department demonstrated that Mr. Bussell resigned due to a knee injury.  The court advised defense counsel that he could ask Mr. Bussell why he left the police department because plaintiffs, on direct examination, had elicited testimony about Mr. Bussell's employment history and the question proposed by defense counsel directly related to Mr. Bussell's credibility. Nonetheless, the court cautioned defense counsel that if Mr. Bussell testified, consistent with the official documentation described by plaintiffs' counsel, that he resigned due to a knee injury,

then defense counsel could not inquire further without permission from the court. As explained by the court:

> If what [plaintiffs' counsel] says is true, I'm assuming it is, that there is some official document that says you're retiring for this particular reason, [and] that's what he says he did, then you're stuck with that. Because that's—there's no basis then to undercut that without going way off into the weeds.

At plaintiffs' counsel's request, the court clarified that it would be improper for defense counsel to refer to the underlying misconduct in front of the jury.

At the conclusion of the sidebar, defense counsel began his cross-examination of Mr. Bussell. After confirming that Mr. Bussell had been employed with the Lenexa police department for approximately 15 years and had left that employment in 2013, defense counsel asked Mr. Bussell why he left that employment. Mr. Bussell responded, "I sought a medical retirement because of my knee." The following exchange then occurred:

Q: Well, there were other reasons, weren't there?

A: No. That's what I sought was a medical retirement for my knee.

Q: I think there were other reasons that are documented, sir.

Plaintiffs' counsel then objected and the court sustained that objection, instructing defense counsel not to inquire further. Defense counsel then proceeded to follow a different line of questioning.

Plaintiffs now assert that defense counsel's comment suggesting that "other reasons" existed for Mr. Bussell's decision to leave his employment is sufficient to require a new trial. The court disagrees. To begin, defense counsel did not indicate the substance of any other reasons that might have existed for Mr. Bussell's decision to leave his employment. While his

comment may have carried a negative implication, defense counsel stopped well short of identifying any misconduct on the part of Mr. Bussell.  Moreover, while the court sustained plaintiffs' objection, plaintiffs did not seek a contemporaneous instruction for the jury to disregard defense counsel's comment nor did they seek any other curative instruction at that time.  Of course, the court had instructed the jury before opening statements in the course of its preliminary instructions that statements, arguments and questions by lawyers are not evidence and could not be considered by the jury.  That instruction was repeated in the court's final instructions.  Because the court presumes that the jury followed the instructions given to it, *see Cavanaugh v. Woods Cross City*, 718 F.3d 1244, 1250 (10th Cir. 2013), the court cannot conclude that the remark made by defense counsel was prejudicial.

To be sure, the jury's verdict demonstrates that they were not persuaded by Mr. Bussell's opinion that a field test performed on the type of tea brewed by Ms. Harte would not or could not yield a false positive result.  But there were several reasons why the jury might have discounted the testimony of Mr. Bussell, none of which had anything to do with defense counsel's isolated comment.  For example, during defense counsel's voir dire of Mr. Bussell regarding his testimony, Mr. Bussell agreed that the temperature at which tea is brewed has a significant effect on the amount of caffeine that is extracted from those tea leaves and then candidly admitted that he did not know or measure the temperature he utilized when he brewed the samples for his tests.  Because defendants' theory of the case was that the caffeine levels in

Ms. Harte's tea caused the false positive test results, that testimony undoubtedly undercut the persuasiveness of Mr. Bussell's opinion.[11]

For the foregoing reasons, the court is not persuaded that the comment made by defense counsel prejudiced plaintiffs. A new trial is not warranted on this basis. *See Rios v. Bigler*, 67 F.3d 1543, 1550 (10th Cir. 1995) (district court is in the best position to assess whether remark was prejudicial for purposes of motion for new trial); *Ryder v. City of Topeka*, 814 F.2d 1412, 1425 (10th Cir. 1987) (misconduct of trial counsel justifies new trial only upon showing of prejudice).

E.    *Cumulative Error*

Lastly, plaintiffs assert reversible error under the cumulative error doctrine. Under a cumulative-error analysis, the court "aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and . . . analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *Estate of Trentadue ex rel. Aguilar v. United States*, 397 F.3d 840, 860 (10th Cir. 2005) (citing *United States v. Rivera*, 900 F.2d 1462, 1470 (10th Cir.1990)). "[J]ust as harmless-error analysis is utilized only to determine whether actual error should be disregarded, a cumulative-error analysis aggregates only actual errors to determine their cumulative effect."

---

[11] In addition, Mr. Bussell testified during his direct examination that every KN reagent field test he performed on the type of tea brewed by Ms. Harte "came back negative" for marijuana. On cross-examination, Mr. Bussell admitted that he had obtained a false positive result on a type of tea brewed by Ms. Harte using another type of field test. By failing to disclose that he utilized multiple types of field tests and obtained a false positive with one of those tests, Mr. Bussell could have left the impression with the jury that he was not being totally forthcoming.

*Id.* (quoting *Rivera*, 900 F.2d at 1470). Because plaintiffs have failed to demonstrate the existence of any errors during the course of the trial, their cumulative-error argument necessarily fails.

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiffs' renewed motion for judgment as a matter of law (doc. 467) is **denied** and plaintiffs' motion for a new trial (doc. 470) is **denied**.

**IT IS SO ORDERED.**

Dated this 29th day of March, 2018, at Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge

37